UNITED STATES, Appellee

v

VADIS STOREY, Airman First Class, U. S. Air Force, Appellant

9 USCMA 162, 25 CMR 424

*Major George M. Wilson* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ellis L. Gottlieb* and *Lieutenant Colonel R. W. Dech.*

*Captain Lawrence J. Gross* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis P. Murray* and *Lieutenant Colonel Robert W. Michels.*

## Opinion of the Court

HOMER FERGUSON, Judge:

At about eleven o'clock on the evening of July 27, 1956, the accused entered the barracks room of two airmen. One was lying on a bunk while the other was seated at a table. After entering the room, the accused closed the door and sat at the foot of the occupied bunk. He greeted the occupants by saying, "Hi," and without further ado pulled a pistol from his top pocket and fired one shot into the wall of the room. The occupants of the room requested that he leave, whereupon he arose, placed the pistol back in the pocket from which he had drawn it, and left. The accused's facial expression remained the same throughout this brief episode.

The Charge of Quarters, on hearing "small explosions going on in the squadron area," decided to investigate. He met the accused on the stair landing of his barracks and requested that he surrender the pistol. The accused refused. He then told him to return to his room and go to bed, which the accused agreed to do. The Charge of Quarters then notified the Air Police.

An Air Policeman, responding to the call for assistance, found the accused walking in a street near his barracks with a pistol in his right hand. When he first saw the accused, he was approximately fifty feet away. While the accused's back was turned, he yelled to him in a loud voice, "I am an Air Policeman. I am behind you. You will drop your weapon on the ground, raise your hands, and don't turn around."

Upon hearing this, the accused turned around and said, "You are kidding." The Air Policeman thereupon fired a shot to the left of the accused. The accused remained unconvinced by this warning and stepped forward, saying, "You are still kidding." To prove otherwise, the Air Policeman fired another shot, this time to the right side of the accused. After firing the second shot, the accused again advanced, and again remarked, "You are still kidding." He was again told to drop his weapon and a third shot was fired a foot or two away from his feet. After the third shot, the accused said, "Oh, I see you now." At this time the accused was approximately thirty feet away from the Air Policeman. When the accused stepped forward again, the Air Policeman could see "the pistol barrel . . . in line with me." He thereupon dropped to one knee and told the accused that if he didn't lay the weapon down, he would shoot him. The accused reacted to this warning by saying, "You are still kidding." A fourth shot was fired. The accused then threw the pistol down saying, "Here, take the dam [sic] thing." After warning the accused several times to back away from the pistol, he finally responded and the weapon was retrieved. The accused was then taken to Air Police Headquarters where a search of his person revealed an unopened half pint of whiskey. Each prosecution witness, including the two airmen who occupied the barracks which the accused had entered, the Charge of

Quarters, the Air Policeman who had apprehended the accused, and the airman who later searched the accused, described him as being in varying stages of intoxication.

This series of events resulted in the accused's conviction by general court-martial at Keesler Air Force Base, Mississippi, for assaulting an Air Policeman in the execution of his duties and willfully discharging a firearm, both in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was also found guilty of violating a lawful general regulation by introducing an alcoholic beverage on the base, in contravention of Article 92 of the Code, supra, 10 USC § 892. The findings and sentence as approved by the convening authority were subsequently affirmed by the board of review. The Judge Advocate General of the Air Force has certified six issues to this Court, which concern the correctness of certain conclusions reached by the board of review in its opinion. These issues will be discussed later in this opinion. It is first desirable, however, to relate the evidence presented on behalf of the accused.

The defense first presented three character witnesses, each of whom testified substantially that he had known the accused a considerable period of time and that his reputation in the community was good and his performance of duties was excellent. It was also stipulated that the accused had been on continuous active duty for some fourteen years. The defense next called Captain Abrams, a neuropsychiatrist, who had examined the accused. At the outset Captain Abrams made it clear that the accused was not legally insane either at the time the offenses were committed or at the time of trial. He then proceeded to give his "evaluation, diagnosis and prognosis" of the accused. In his opinion the accused was suffering from a mental disorder falling within the "character and behavior group." Although he could distinguish right from wrong and adhere to the right, his ability to do so was impaired. The assault on the Air Policeman and the wrongful discharge of the firearm were for the most part, in his opinion, the product of: "1. His psychiatric illness; 2. His minimal or marginal intellectual ability; and 3. His state of alcoholic intake at that time." He further stated that because of his psychiatric condition he did not believe the accused was capable of "form[ing] completely the degree of premeditation, intent, willfulness or malice called for by the nature of the alleged charges." The psychiatric testimony was the only evidence presented regarding the accused's mental condition.

After the defense had presented its case and closing arguments had been made, the law officer instructed the court on the elements of the offenses charged. He further instructed on voluntary intoxication and lack of mental capacity as these conditions affected the accused's ability to entertain the specific intent to willfully discharge a firearm or to recognize an air policeman. There were no objections or requests for additional instructions.

The dominant issue, as framed in the certified questions, is a narrow one. Stated briefly, it is this: May a condition characterized as a character and behavior disorder cause a lack of mental capacity to intend?[1] Like the board of review below we have little desire "to construct or perpetuate any semantical labyrinths" concerning the question of categorized mental defects. We are not disposed—assuming our technical competency—to define or distinguish the entire panoply of psychiatric conditions included within the concepts of modern psychiatry.[2]

---

[1] Throughout its opinion the board employed the term "lack of mental capacity to intend" to avoid the "confusion" which it found had resulted from use of such descriptive phrases as "partial mental impairment" or "partial insanity." The Judge Advocate General of the Air Force has utilized the same terminology in drafting the certified issues and we will likewise refer to the defense in that manner in this opinion.

[2] SR 40–1025–2; NAVMED P–1303; AFR 160–13A, June 1949, Joint Armed Forces, NOMENCLATURE AND METHOD OF RECORDING PSYCHIATRIC CONDITIONS,

As one student of the problem has remarked, "Between the two extremes of 'sanity' and 'insanity' lies every shade of disordered or deficient mental condition grading imperceptibly one into the other." Weihofen, Partial Insanity and Criminal Intent, 24 Ill Law Rev 505, 508. If the certified question seeks to review our attitude toward the military nomenclature of the terminology and classification of mental conditions, we must decline the invitation. We recognize that nonmilitary doctors might—and quite often do—define particular mental conditions in different ways. As a matter of fact, the military psychiatrist who testified in the instant case expressed considerable personal doubt on the subject of categorizing mental conditions. He explained that "in the military structure it has been ordained almost in a legal fashion that

list the following classifications of psychiatric conditions which are recognized by the services:

"*a. Psychotic disorders.*
 (1) Schizophrenic reactions:
 (*a*) Schizophrenic reaction, simple type
 (*b*) Schizophrenic reaction, hebephrenic type
 (*c*) Schizophrenic reaction, catatonic type
 (*d*) Schizophrenic reaction, paranoid type
 (*e*) Schizophrenic reaction, latent
 (*f*) Schizophrenic reaction, NEC
 (2) Affective reactions:
 (*a*) Manic-depressive reaction
 (*b*) Psychotic depressive reaction
 (*c*) Involutional Melancholia
 (3) Paranoid reactions:
 (*a*) Paranoia
 (*b*) Paranoid state
"*b. Psychiatric disorders with demonstrable physical etiology or associated structural changes in the brain:*
 (1) Psychotic disorders with demonstrable physical etiology or associated structural changes in brain
 (2) Nonpsychotic mental disorders with demonstrable physical etiology or associated structural change in brain
"*c. Psychoneurotic disorders:*
 (1) Anxiety reaction
 (2) Dissociative reaction
 (3) Conversion reaction
 (4) Phobic reaction
 (5) Obsessive-compulsive reaction
 (6) Neurotic depressive reaction
 (7) Somatization reactions:
 (*a*) Psychogenic cardiovascular reaction
 (*b*) Psychogenic gastrointestinal reaction
 (*c*) Psychogenic respiratory reaction
 (*d*) Psychogenic genito-urinary reaction
 (*e*) Psychogenic skin reaction
 (*f*) Psychogenic musculo-skeletal reaction
 (*g*) Psychogenic asthenic reaction
 (*h*) Psychogenic reactions affecting other systems
 (8) Hypochondriacal reaction
"*d. Character and behavior patterns:*
 (1) Pathological personality types:
 (*a*) Schizoid personality
 (*b*) Paranoid personality
 (*c*) Cyclothymic personality
 (*d*) Inadequate personality
 (*e*) Antisocial personality
 (*f*) Asocial (Amoral) personality
 (*g*) Sexual deviate
 (2) Immaturity reactions:
 (*a*) Emotional instability reactions
 (*b*) Passive dependency reaction
 (*c*) Passive-aggressive reaction
 (*d*) Aggressive reaction
 (*e*) Immaturity with symptomatic habit reaction
 (3) Alcoholism (except simple drunkenness or acute poisoning due to alcohol)
 (4) Addiction
 (5) Primary childhood behavior reaction
"*e. Disorders of intelligence:*
 (1) Mental deficiency, primary
 (2) Mental deficiency, secondary
 (3) Specific learning defect
"*f. Transient personality disorders due to acute or special stress:*
 (1) Combat exhaustion
 (2) Acute situational maladjustment"

people with the diagnosis that falls within the character and behavior disorder group have certain implications; and those falling in the neurotic and psychotic group have other implications." He went on to explain, however, that "this does not mean that a person is healthier because he has a character disorder, or that he is sicker because he has a neurotic or psychotic disorder —because of the type diagnosis they have. In a modern psychiatric frame of reference, many character disorders are much sicker than are the psychoneurotic and psychotic groups."

Our research has failed to disclose any general recognition of the term "character and behavior disorder" among the leading treatises of psychiatry. Davidson, in his work on "Forensic Psychiatry," 1952 ed, under the heading of "Psychopathic Personality," (page 217), makes mention of "disorders of character" such as "alcoholism, sexual perversion, drug addiction and psychopathy." He recognizes the general confusion which has arisen as a result of the use of the phrase "psychopathic personality" and readily concedes that since "psychiatrists are unable to agree on the meaning, the judicial authorities are understandably reluctant to adopt a general rule about the competency of psychopaths." Guttmacher and Weihofen in "Psychiatry and the Law," 1952 ed, are of the opinion that the term "psychopath" "is probably the most abused word in the whole psychiatric vocabulary" (page 86). It is even noted that some psychiatrists have completely discontinued the use of the term together with the concept which it represents. The authors explain that this represents merely "another instance of the fluid state of psychiatric ideology . . . [which] may seem upsetting to many lawyers, preoccupied as they typically are in seeking certainty in precedent." Cleckley, in his highly regarded book, "The Mask of Sanity" (3d ed), refers to the psychopathic personality group as the "unclassified people." He notes the confusion and inconsistencies which have developed concerning an individual classified under the so-called psychopathic personality group.

For this Court, therefore, the question is not one of classification but of effect. We are concerned only with whether credible evidence exists which may properly be considered by the triers of the fact in determining whether an accused lacks the mental capacity to entertain a specific intent or have whatever other state of mind is required for the offense charged. We prudently leave the question of classification to the psychiatrists. Accordingly, we hold that it is the evidence presented concerning the disorder which raises the issue and not the nomenclature used to classify it.

We next consider the question of whether the issue was raised in the case at bar. Psychiatric testimony produced on the accused's behalf was merely to the effect that his condition was one which would produce only an "impaired ability" to form a specific intent and not a total "inability" to do so. More than partial mental impairment must be shown in order to raise the issue. There must be evidence from which a court-martial can conclude that an accused's mental condition was of such consequences and degree as to deprive him of the ability to entertain the particular state of mind required for the commission of the offense charged. United States v Kunak, 5 USCMA 346, 17 CMR 346. In the instant case there is a complete absence of any evidence showing *lack of capacity to intend,* as distinguished from *an impaired ability to intend.* We conclude, therefore, that the issue of lack of mental capacity to intend was not raised and accordingly the law officer was under no duty to so instruct. In view of our holding on the certified questions noted above, further discussion of the remaining issues is unnecessary.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in part and dissenting in part):

Six certified questions have been di-

167

rected to this Court which will be reproduced and answered at the end of this opinion. In holding that the evidence at trial failed to raise the defense of partial responsibility, my brothers may affirm the decision of the board of review without a discussion of all the certified issues. As I disagree with them in their conclusion, my consideration must be more detailed than that of the principal opinion. In developing the issue, I will attempt to expound my ideas within the framework of decided cases which have considered the doctrine of partial responsibility. I feel that such a discussion might be helpful as the certified issues suggest that the holdings of this Court are not clearly understood in this area.

Initially, certain distinctions should be made in order to place in proper focus the question which immediately confronts us. Traditionally, the mental condition of an accused was only considered by the courts if it amounted to what was referred to as "legal insanity." Considered within that terminology were (a) those individuals who could not distinguish between right and wrong (reason test), (b) those who could so distinguish but could not adhere to the right (irresistible impulse), and (c) finally those who, although not "totally insane," were laboring under a mental delusion which, if true, would exculpate their guilt (mono mania). Most jurisdictions would totally exculpate a man of criminal responsibility if his mental condition placed him in one of the above enumerated categories. See Annotation, 45 ALR2d 1447 (1956). There is little need to remind the reader that in recent years, courts have broadened and liberalized the categories of total insanity. Durham v United States, 214 F2d 862 (CA DC Cir) (1954); Utah v Kirkham, 319 P2d 859 (Utah Sup Ct) (1958). Cases discussing that mental state are myriad and the vast amount of writing, both psychiatric and legal, which involves the subject is notorious even to the layman.

In a laudable attempt to develop a test which would effectively acquit from guilt the totally insane, the field of partial responsibility has been underdeveloped so that it stands today wearing the same cloak of incredulity that it had a half century ago. Before I attempt to discuss this doctrine, however, I should emphasize that I use the phrase "less than legal insanity" to mean a mental impairment which is not so complete as to relieve an accused from complete criminal responsibility according to the test in force in the particular jurisdiction wherein the accused has been tried. Thus, I think it best to discard the use of the term when referring to mono mania—a practice which some courts in the past have failed to do. See Weihofen, Partial Insanity and Criminal Intent, 24 Ill Law Rev 505, 509 (1930). Disregarding the cases which actually deal with mono mania, I find a dearth of material on the concept of partial responsibility which may be accounted for because of the law's abhorrence to change. What I do find deals principally with the effect of that particular mental condition in capital cases, as a few jurisdictions allow a mental condition less than legal insanity to be introduced in proof of a lack of mental capacity to premeditate or deliberate. Jurisdictions which have adopted this principle are: People v Wells, 33 Cal2d 330, 202 P2d 53 (1949); Battalino v People, 118 Colo 587, 199 P 2d 897 (1948); State v Johnson, 40 Conn 136 (1873); Aszman v State, 123 Ind 347, 24 NE 123 (1890); Rogers v Commonwealth, 96 Ky 24, 27 SW 813 (1894); Commonwealth v Trippi, 268 Mass 227, 167 NE 354 (1929); Washington v State, 165 Neb 275, 85 NW2d 509 (1957); State v Schilling, 95 NJL 145, 112 Atl 400 (1920); People v Moran, 249 NY 179, 163 NE 553 (1928); State v Fenik, 45 RI 309, 121 Atl 218 (1923); State v Green, 78 Utah 580, 6 P2d 177 (1931); Hempton v State, 111 Wis 127, 86 NW 596 (1901); and apparently Scotland, Minutes of Evidence, Royal Commission on Capital Punishment, August 5, 1949. See also Fisher v United States, 328 US 463, 66 S Ct 1318, 90 L ed 1382 (1946) (separate opinions of Mr. Justice Murphy and Mr. Justice Frankfurter).

168

This Court, in an opinion by the author Judge, accepted this principle, holding that:

". . . While a mental disorder, something less than insanity, may interfere with the ability to premeditate, it does not exonerate an accused from the commission of a crime involving only a general intent." [United States v Kunak, 5 USCMA 346, 365, 17 CMR 346, 365.]

Accord, United States v Smith, 5 USCMA 314, 17 CMR 314; United States v Dunnahoe, 6 USCMA 745, 21 CMR 67.

*Kunak* was, as I have suggested, a murder offense and our *holding* in that case limited the use of a mental condition less than legal insanity to capital offenses. The principal opinion cites the *Kunak holding* as extending to all offenses which require a special state of mind, such as knowledge or specific intent. I do not suggest that this is not the state of the law but I do not believe that a citation to *Kunak* adequately expresses the rationale which caused us to broaden that holding in some of our later cases. A full explanation is especially desirable when one considers that no other common law court has so held. See American Law Institute, Model Penal Code, Tentative Draft No. 4, Appendix A, Criteria of Responsibility under Existing Law, as reprinted, 46 J Crim L 458 (1955); Report of British Royal Commission on Capital Punishment, 1949–1953, Appendix 9, II. It is interesting to note, in this regard, that the Court of Appeals for the District of Columbia, after its pronouncements in United States v Durham, supra, refused to apply the doctrine of partial responsibility even to the limited area of capital offenses. Stewart v United States, 214 F2d 879 (CA DC Cir) (1954). See, United States v Smith, supra, at 344; Note, The Durham Case: "Mental-Cause" As a Criminal Defense, 43 Georgetown L J 58 (1954).

I have come across only one decision —outside of this Court—which seems to suggest that the doctrine under discussion should be extended to all specific intent crimes. In the case of Stevens v The State, 31 Ind (Black) 485 (1869), the court stated at page 491:

"In a criminal case, the jury must be satisfied beyond a reasonable doubt of the defendant's mental capacity to commit the crime charged. *This is but an application of the general principle, that the criminal intent must be proved, as well as the act; that without a capable mind, such intent cannot exist, the very element of crime being wanting.* Such terms as 'criminal intent,' 'vicious will,' and 'use of reason,' are used in a very broad and general sense, including the idea that the mind must be in such a reasonable condition as to be capable of giving a guilty character to the act. The will does not join with the act, and there is no guilt, when the act is directed or performed by a defective or vitiated understanding. So far as a person acts under the influence of mental disease he is not accountable." [Emphasis supplied.]

This idea appears not to have been used by us until 1954 when the late Judge Brosman wrote, for a unanimous Court, United States v Higgins, 4 USCMA 143, 15 CMR 143. There the accused was charged with disrespect toward a superior officer, willful disobedience of the order of the same officer, and assault and battery. The certified question before us asked whether the law officer was required to instruct the members of the court more specifically as to the effect of intoxication or amnesia upon the accused's knowledge, at the time and place of the offenses, that the person addressed and disobeyed by the accused was his superior officer. In deciding that case, we said:

". . . Moreover, if an accused person may lessen his criminal responsibility by a showing that he was not able to entertain premeditation, intent, or knowledge due to voluntary intoxication—a condition largely within his own control, and disapproved by society and the law—we would regard as anomalous a refusal to permit a showing that premeditation, intent, or knowledge was or might be wanting due to some mental

**169**

derangement—usually without the accused's control. It would seem to follow that if an accused person produces evidence of an underlying mental state, which might have served to affect his intent at the time of the acts alleged, then the law officer should advise the court that its members may properly consider the evidence of mental condition in determining the accused's capacity to entertain premeditation, intent, or knowledge—when any of these is relevant to an offense charged. However, a showing of amnesia *without more* would not necessitate such an instruction."

We have repeated this thought more than once, United States v Fleming, 7 USCMA 543, 562, 23 CMR 7; United States v Kunak, supra, at pages 562–565; and ripened our dicta into a holding in United States v Carver, 6 US CMA 258, 19 CMR 384, wherein the author Judge said at page 269:

"What we held in United States v. Kunak, supra, and United States v. Smith, supra, concerning the effect of partial mental impairment upon premeditation, we believe is also applicable to offenses involving a specific intent. We forecast a wider range of applicability in United States v. Holman, 3 USCMA 396, 12 CMR 152; and United States v. Higgins, 4 US CMA 143, 15 CMR 143, as well as in United States v. Kunak, supra, and United States v. Smith, supra, but the question has never earlier been squarely presented except with respect to premeditation.

"We, therefore, hold that mental impairment, short of legal insanity, may affect the ability of an accused to entertain a specific intent. When, as here, such an issue is raised, the law officer errs who fails to instruct on this subject."

The *Carver* case was the terminus of a reasonable evolution. Indeed the difficult step for this Court to take was the initial decision which concedes the validity of partial responsibility as affecting premeditation and deliberation. From there one need not travel far to reach *Carver* as the thrust of this

defense is not directed to the fact that a man's life is involved—although that is certainly a weighty consideration—but rather that a man cannot be convicted of a crime if one of the elements is absent, no matter whether the element is premeditation, specific intent or knowledge. Although other courts have not yet taken this position, its logic has not only been acknowledged but moreover urged by prominent authorities. Weihofen, Partial Insanity and Criminal Intent, supra; Weihofen, Mental Disorder as a Criminal Defense (1954 ed); Hoch and Zubin, Psychiatry and the Law, page 196 (1955 ed). See also Hall, Psychiatry and Criminal Responsibility, 65 Yale Law J 761, 767–68 (1956); Keedy, Insanity and Criminal Responsibility, 30 Harv Law Rev 535, 553 (1917); Keedy, Criminal Responsibility of the Insane, 12 J Crim L 14 (1921). Well aware that the rule I espouse is not supportable by other decisions, I believe it is completely in accord with the common-law principle requiring the presence of every element in the proof of a crime. I am in agreement then with the following principle enunciated by the majority:

". . . We are concerned only with whether credible evidence exists which may properly be considered by the triers of the fact in determining whether an accused lacks the mental capacity to entertain a specific intent or have whatever other state of mind is required for the offense charged. We prudently leave the question of classification to the psychiatrists. Accordingly, we hold that it is the evidence presented concerning the disorder which raises the issue and not the nomenclature used to classify it."

Indeed, I have always believed that a mental state, whether it be identified by psychiatrists as a character disorder or mental disease or derangement, should fall within the purview of the defense of partial responsibility, having written in United States v Dunnahoe, supra:

"In previous holdings, we have placed our stamp of approval on the doctrine that voluntary intoxication, not amounting to legal insanity, may raise an issue of the capacity to pre-

meditate, if the state of intoxication reaches a degree which would interfere seriously with the mental processes. United States v Craig, 2 US CMA 650, 10 CMR 148; United States v Ransom, 4 USCMA 195, 15 CMR 195. No other rational outcome is possible, despite the fact that the accused may be perfectly normal when sober, for actual premeditation must be established, as a factual matter, to support conviction. A fortiori, character disorders of a more permanent character, which render it unlikely that the accused deliberated in a given situation, should be similarly treated. It is certain that arbitrary distinctions must sometimes be made, but the Code establishes different degrees of murder, and premeditation must be proven before an accused can be convicted of the highest degree. It, therefore, is not illogical to assert that whenever an accused is shown to have a condition of the mind which probably would impair his mental capacity to deliberate, the court-martial should be permitted to consider the impairment to determine whether the accused committed the crime with the requisite premeditation."

Counsel for the Government seek to limit this language to a capital offense. I believe that limitation to be logically untenable and arbitrary. If a so-called character disorder may impair an accused's capacity to premeditate, I am unable to conclude it would not operate on those mental processes which are necessarily used in formulating a specific intent.

## II

I now turn to consider whether the issue of partial responsibility was reasonably raised in the instant case. I find that it was and, in this determination, I must part with my brothers. Unlike the author of the principal opinion, I am not at all disturbed by the psychiatrist's use of the words "lack of capacity to intend" as distinguished from an impaired ability to intend. The testimony of the psychiatrist is, as far as the law of evidence is concerned, only one form of expert testimony. It may be accepted or disregarded by the court members. To look only to the statement of a psychiatrist, and determine that by itself it does not raise—although I disagree with this conclusion also—the issue of partial responsibility, is to snatch a finding out of the province of the court-martial and place it in the hands of the psychiatrists. This is not in keeping with the military system of jurisprudence. There is a gap between the law and psychiatry which is difficult to span. Military law has as its prime interest the effect of a man's actions upon military society. Psychiatry, on the other hand, must be basically interested in diagnosing and treating an individual rather than measuring the effect of his acts on the military community. The law, one might say, preserves the Anglo-American system of jurisprudence, while psychiatrists are only desirous of reaching medically sound evaluations. The former speaks in terms of morals and responsibility, the latter in terms of medicine. Under our present trial procedure, I do not think it wise to give the psychiatrist's opinions greater weight than is accorded any other form of expert testimony.

In trying to reach the heart of the medical condition in issue, I quote part of the testimony of the medical expert. He began his testimony by stating that the accused was not legally insane, but that he was suffering from a mental condition which rested within the character and behavior group. The cross-examination revealed the following:

"Q I believe that in your certificate that you prepared on this patient that you said that the accused's ability to adhere to the right was doubtlessly, at least partially, impaired at the time by his alleged alcoholic state, at the time of the alleged acts. Does this mean that you feel that the accused was drunk at the time of these offenses—that is, the firing of the weapon in the barracks, and presentation of a weapon toward Sgt. Grantham—those two acts—that he was under some alcoholic influence?

"A I believe that he was under some alcoholic influence, yes.

**171**

"Q And, do you believe that as a result of that influence that his ability to adhere to the right was consequently affected?

"A I will reiterate again, as I said before, I believe that is one of the factors. There are, in brief, three factors which would impair his ability to adhere to the right: 1. His psychiatric illness; 2. His minimal or marginal intellectual ability; and 3. His state of alcoholic intake at that time.

. . . . .

"Q Now, you have stated the three causes which affected his ability to adhere to the right—you say his condition, the influence of alcohol and his intellectual capacity—roughly, is that correct?

"A Yes.

"Q Now, if one of those things were missing—if the drinking itself were missing, would that change your evaluation any?

"A The only one which would change my evaluation is if he had no psychiatric condition. If only the other two were true, I don't think you would require me to be testifying here.

"Q You are saying even if he were now [sic] drinking this would have been true?

"A Even if he were not drinking he would have had a severe psychiatric condition which would have caused a marked impairment as well as his intellectual capacity.

"Q You have classified this degree of impairment before this session this afternoon—you spoke to me prior and classified it as 'some' impairment. In court you have used the word 'marked' impairment. I would like you to reconcile the two terms.

"A I would say I believe the question asked before had to do with his ability to adhere to the right. I would say in that area there was some impairment, to mean perhaps moderate; as to his ability to form intent of wilfullness, malice, or premeditation, it [sic] would say it was more marked impairment."

Certainly this testimony raised the issue of mental impairment. The issue is raised when the evidence shows a reasonable probability that the accused's capacity was impaired. Here the medical expert has said that the accused suffers a marked impairment of his mental faculties. The majority would require him to state the impairment was total. In that area, I must accept the judgment of the experts for my knowledge of psychiatry is not so advanced that I can conclude whether psychiatrists are able to measure the inner recesses of the mind with any degree of accuracy. As one of the country's leading forensic psychiatrists has stated:

"The concept of diminished or partial responsibility has many proponents among psychiatrists. It seems to me to be entirely consistent with what we know of mental life,—everything is not black or white but there is a variety of greys. Moreover, it seems to me to strengthen the philosophical rationale of the concept of responsibility. The law does give recognition to diminished responsibility in arriving at the various degrees of homicide. There is, of course, the danger that the concept would be pursued beyond reasonable limits and that psychiatrists might be required to give degrees and percentages of responsibility, just as the orthopedic expert is asked to state percentages of disability in personal injury cases. This would be a travesty.

. . . . .

"It seems to me that all that should be expected of the psychiatrist is the following:

"1. A statement as to whether the defendant is suffering from a definite and generally recognized mental disorder and why and how this conclusion was reached.

"2. If it has been asserted that the defendant suffered from a mental disorder, its name and its chief characteristics and symptoms, with particular emphasis on its effect on an individual's judgment, social behavior and self-control, should be given.

"3. There should then follow a statement of the way and degree in which the malady has has [sic] affected the particular defendant's behavior, especially in regard to his

judgment, social behavior, and self-control.

"4. He should then be asked whether the alleged criminal act was, in his opinion, a product of the mental disorder." [Guttmacher, Principal Difficulties with the Present Criteria of Responsibility and Possible Alternatives, American Law Institute, Model Penal Code, Appendix B, as reprinted, 46 J Crim L 463, 467–69.]

Legal scholars have also agreed that this is one of the basic problems which the courts are faced with today:

"Of course, it would still be extremely difficult to measure the degree of capacity for control. But surely no test can be devised that will eliminate all difficulty for the psychiatrist in making judgments that are difficult by nature. Any effort to accomplish this result would certainly be so simplistic that its failure is foredoomed. *I should suppose, though, that you would agree that it is easier to express the judgment that there was substantial impairment of capacity than to express the judgment that capacity was totally impaired.* I should also suppose that if you estimate the matter in terms of your current practice, the cases that really worry you are those where you are satisfied that there was very great impairment of capacity, but still may find it difficult to say that the impairment was complete." [Letter from Herbert Wechsler to Dr. Manfred Guttmacher, November 11, 1954, as reprinted, 45 J Crim L 475. Emphasis supplied.]

But in the final disposition of this issue it must be remembered that the court-martial did not consider medical evidence alone. The facts in the case certainly suggested that the accused was not in full possession of normal mentality. Among other things, the evidence shows that he entered the room of two airmen, greeted them by saying "Hi!" and without further remarks, fired a shot into the wall, without changing the expression upon his face. Upon being asked, he quietly left the room. The testimony as to his appre-

hension, summarized by the staff judge advocate, is also rather telling:

". . . From a distance of 45 to 50 feet, Sergeant Grantham told the accused that he was an air policeman and ordered him to drop his weapon to the ground, raise his hands and not to turn around. Turning to his left, the accused immediately turned about and faced Sergeant Grantham. Sergeant Grantham repeated the order to drop the weapon stating that he would fire if it was not dropped. The accused said 'You are kidding' and Sergeant Grantham fired one shot to the left of the accused's feet. Again Sergeant Grantham told the accused to drop the weapon, and the accused replied 'You are still kidding', at the same time taking one step towards Sergeant Grantham. Sergeant Grantham fired another shot near the accused's feet. The accused again said 'You are still kidding' and took another step in Sergeant Grantham's direction. For the third time Sergeant Grantham told him to drop his weapon and fired a third shot at his feet. After the third shot, the accused said 'Oh! I see you now' and took another short step forward. At that time the accused was 25 to 30′ from Sergeant Grantham. When he first saw the accused, the accused was holding the pistol at about a 45° angle toward the ground. When the accused stopped and said 'Oh! I see you now', the gun barrel was 'in line' with Sergeant Grantham. Sergeant Grantham dropped to one knee to remove himself from the line of fire and told the accused that he would fire one more shot as a warning and if he did not drop his weapon he would shoot him. The accused repeated 'You are still kidding' and Sergeant Grantham fired the fourth shot. When Sergeant Grantham told the accused for the second time that he would shoot him if he did not drop his weapon, the accused threw the weapon on the grass at his feet, saying 'Here, take the damn thing'."

The pattern of behavior which these acts indicate, coupled with the psychiatric testimony, were sufficient to raise reasonably the question of the accused's

partial mental responsibility. This is where I disagree with the board of review, for it bottomed its decision on the principle that the record must show some evidence of total impairment, and I do not believe it practicable to place all mental deficiencies on one side of a rigid line. In the words of the experts who deal in this field, all areas are not either black or white, some are a blend of both.

### III

In arriving at my disposition, I must consider whether the law officer instructed the court properly. ▆▆▆▆▆▆▆ He first instructed upon the defense of legal insanity, and then I suppose attempted to frame his charge to meet the evidence on partial responsibility. This is the portion of his instruction on this as part of the case:

". . . However, the issue of lack of capacity with which you are confronted is a factual issue concerning another defense, wherein your attention is specifically directed to the application of the evidence as to the accused's capacity to entertain a particular state of mind as to a particular element of the offense. Now: it is therefore your duty to weigh all of the evidence which has been submitted to you with respect to the accused's mental impairment, and apply it to specific elements of the offenses, as follows: If you find that the accused did not have the requisite mental ability, or if you find that his ability to recognize Sgt Grantham as an Air Policeman was so impaired that he did not so recognize him, or could not so recognize him, as such, then you must find him not guilty of Specification 1, Charge I. If you find that the accused's ability to formulate the requisite willfulness required in Specification 2, Charge I, was so impaired that he could not or did not formulate such willfulness, that is to say, that he could not or did not willfully discharge the weapon, as you have been instructed, then it is your duty to find him not guilty of Specification 2, Charge I."

When this instruction is considered in its entirety, there is a fair risk that it might be misinterpreted to shift the burden of proof to the accused, as contended by defense counsel. However, I can leave that assertion unanswered for I believe the charge does not adequately point up to the court-martial the possibility of considering the testimony of accused's mental state to reduce the crimes to those which are included but which do not involve a specific criminal intent. The quoted portion of the instructions makes mention only of exculpation and offers no different alternative than do the instructions on legal insanity. Accordingly, the court-martial was given only one theory and that was, in essence, that they must return a finding of not guilty if they found total or partial mental responsibility. That did not place the issue as I see it in its proper perspective, for a lack of mental capacity to know or form a specific intent may eliminate one element of the greater offense but it does not completely absolve the accused. Assuming the elimination of one element of an offense, the others may remain untouched and they may form the base for a lesser included offense. I have no doubt that the law officer was attempting to charge on that theory but I am reasonably certain that the way in which he worded his instructions would not convey that hypothesis to the court-martial. Obviously the finding as returned must be interpreted to mean that the court-martial found the accused was mentally capable of forming the willfulness required in one specification and the knowledge necessary in the others but, speaking separately about each specification, the court was given only two alternative findings when there should have been three. I would therefore conclude the court-martial was not furnished with the requisite guideposts.

Because of the uncertainty of the law in this area and the failure on the part of the law officer to instruct properly on the included offenses, I would not impose a waiver in this instance.

For the foregoing reasons I would answer the certified questions in the following manner:

174

Q. "Was the Board of Review correct in holding that a character or behavior disorder is a condition which may cause a lack of mental capacity to intend?"

A. Yes.

Q. "Was the Board of Review correct in holding that where there is affirmative evidence of mental capacity to intend, although impaired or diminished, and no evidence of total incapacity to intend, instructions on partial criminal responsibility are not required?"

A. No.

Q. "Was the Board of Review correct in holding that, in the absence of evidence establishing mental capacity to intend, evidence of only an *impaired* mental capacity to intend is insufficient to raise an issue of the accused's capacity to intend so as to require instructions thereon?"

A. No.

Q. "Was the Board of Review correct in holding that, as a matter of law, the evidence in this case did not reasonably raise the issue of accused's capacity to have the state of mind required in the offenses alleged in Specifications 1 and 2, Charge I?"

A. No.

Q. "If the preceding question is answered in the negative, was the instruction given by the law officer on partial mental impairment, when considered with the instructions as a whole, sufficient to discharge his duty in that regard?"

A. No.

Q. "If the preceding question is answered in the negative, did trial defense counsel waive any deficiency in such instructions?"

A. No.

I would reverse the decision of the board of review.