UNITED STATES, Appellee

v

GILBERT CHAPPELL, Jr., Private First Class, U. S. Army, Appellant

19 USCMA 236, 41 CMR 236

*Captain Howard L. Kaplus* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent* and *Captain Karl J. Uebel.*

*Captain Salvatore A. Romano* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant* and *Major Edwin P. Wasinger.*

## Opinion of the Court

DARDEN, Judge:

A general court-martial convicted the accused of unpremeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918, despite his plea of not guilty. The sentence was a dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for life. After the convening authority approved the sentence and a board of review affirmed the findings and the sentence, this Court granted review to consider whether the accused was prejudiced by the limited nature of a stipulation regarding his mental responsibility.

Before findings, the trial counsel read into evidence by oral stipulation extracts from a psychiatric evaluation of the accused conducted by an Army medical unit at Nha Trang, Vietnam. The military judge treated the stipulation as one of expected testimony. The trial counsel read these extracts:

"Paragraph 1 reads: This is to certify that the above named individual was evaluated at the 8th Field Hospital from 10 November 1968 to 15 November 1968.

"Paragraph 2 reads: This 21 years old single, enlisted man, with approximately 14 months active duty service and 9 months in Vietnam was referred for psychiatric evaluation in connection with judicial proceedings.

"The other stipulated portion is the psychiatrist's findings, again with the consent of the accused:

"First, The accused at the time of the alleged offense was so far free from mental defect, disease, or derangement as to be able to distinguish right from wrong.

"Two, he was also so far free from mental defect, disease or derrangement [sic] to be able to adhere to the right.

"Three, the accused possesses sufficient mental capacity to understand the nature of the proceedings against him and should be able to assist the court in his own defense."

The complete report of the psychiatric evaluation appears at the end of this opinion as an Appendix. It shows that the findings of the psychiatrist were contained in paragraph 12 of the evaluation. The critical part of the stipulation consisted only of subparagraphs (1), (2), and the first half of subparagraph (3) of paragraph 12. The rest of paragraph 12 is:

". . . In my opinion, he lacks sufficient mental capacity to 'intelligently conduct' his own defense in the sense he may not perceive the significance of some of his testimony nor understand the procedures of the court in determining guilt or innocence.

"(4) In my opinion the accused's mental defectiveness, emotional instability, past history, all indicate an inability to form the specific intent of premeditation, and rather that the alleged crime was an impulsive

**237**

one committed by an unstable, mentally defective person."

The whole defense hinged on the mental responsibility of the accused. The defense requested instructions on the lesser included offense of voluntary manslaughter based on the provocation generated by an assault committed by one Kelly and a threat by Kelly to put a bullet between the accused's eyes.

Before this Court, the appellate defense counsel argue that the trial defense counsel stipulated to the parts of the psychiatric evaluation that were most favorable to the Government and excluded the parts of the psychiatric report that were favorable to the defense. They also urge that the observations of the psychiatrist on the inability of the accused to make rational judgments in complex threatening social situations would have aided the court in understanding his state of mind.

In its brief and oral argument the Government hypothecates that the limited nature of the stipulation was a result of the defense counsel's deliberate trial strategy. The development of this hypothesis is that the full report, notably paragraphs 3, 4, and 11, portrays the accused as an emotionally unstable person with a history of resorting to violence. To keep this information from the members of the court and yet to raise the issue of the accused's sanity, the defense counsel resorted to the testimony of lay witnesses and that of the accused. Such a strategy had the effect, this argument continues, of precluding the Government's getting before the court the details of the accused's mental make-up but of permitting the defense to pursue the sanity issue through lay witnesses and the accused. Our decision can be made without our evaluating the soundness of this supposition.

The accused became a member of the armed forces under a program known as "Project 100,000," which involved the acceptance for military service of persons who did not qualify under the normal mental or physical standards. Persons accepted under this program received special training or treatment intended to permit them to become useful members of the armed forces. This case is at least one instance in which the departure from the normal standards had tragic consequences for the victim and the accused.

United States v Storey, 9 USCMA 162, 25 CMR 424 (1958), is the controlling precedent in this Court for the position that lack of capacity to entertain the requisite premeditation, intent, or knowledge must be a total one and not merely an impaired capacity. *Storey* involved an accused with minimal or marginal intellectual ability about whose mental responsibility psychiatric testimony showed an impaired ability to form a specific intent and not a total inability to do so. Holding that the issue of lack of mental capacity to intend was not raised, a majority of this Court left undisturbed a board of review decision that instructions on partial mental responsibility are not required where the evidence is of only an impaired or diminished capacity to intend and evidence of total incapacity to intend was absent.

The issue in almost all the cases that this Court has decided earlier arose from errors asserted as a result of faulty instructions or a refusal or failure to instruct. In the instant case the instructions have not been assailed. Without requiring the complete lack of capacity to intend that United States v Storey, supra, seems to require, the law officer instructed the members that:

". . . [T]he accused may be sane and yet, because of some ununderlying mental defect, disease or impairment may be mentally incapable of entertaining the intent involved in the offense of unpremeditated murder and the offense of voluntary manslaughter. You should therefore consider in connection with all the other relevant facts and circumstances evidence tending to show that the accused may have been suffering from a mental defect, disease or impairment of such consequences or degree as to deprive him of the

ability to entertain the intent involved in the offense alleged of unpremeditated murder and the lesser included offense of voluntary manslaughter."

Such an instruction was required only if the parts of the psychiatric report that were excluded from the stipulation introduced in evidence may properly be considered "evidence tending to show that the accused may have been suffering from a mental defect, disease or impairment of such consequences or degree as to deprive him of the ability to entertain the intent involved in the offense alleged." Under the standard of *Storey*, the excluded parts of the report are evidence of a diminished capacity to intend instead of a complete lack of such capacity. Insofar as this part of the evidence relating to sanity is concerned, the instruction quoted above was a gratuity.

The members were instructed also that they must be satisfied beyond a reasonable doubt that the accused at the time of the alleged offense was mentally capable of entertaining and did entertain the requisite intent that was explained to them.

A person with the limited intellect[1] and the volatile emotions of the accused was surely subjected to much greater stress on active duty than he would have experienced in his home environment. Our sympathetic understanding of his limitations, however, is not an adequate basis for us to hold, in effect, that he was deprived of the effective assistance of counsel because his counsel agreed to the stipulation. The trial defense counsel in this case was not an inexperienced one. He is a certified counsel in the grade of Major. That the complete report might have had an emotional impact on the court members is not a justifiable reason for reversal. Under the standards of mental responsibility that this Court applies, the full report did not contradict its conclusions; the supporting comments failed to establish that at the time of the offense the accused was totally incapable of adhering to the right or was totally incapable of entertaining the intent to kill. We are satisfied also that the triers of fact were not denied information that was likely to change their decision.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

Contrary to his plea, the accused was found guilty of the charge of unpremeditated murder and sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for life. His defense was based on a lack of mental responsibility at the time of the offense because of an inability to form the requisite intent to kill. We granted review to consider whether the accused was prejudiced by the limited nature of a *stipulation* regarding his mental responsibility.

After the Government rested its case, the defense presented the accused who testified under oath as to the events surrounding the alleged offense. In rebuttal, trial counsel, by way of *stipulation*, to which defense counsel consented, put into evidence the following extracts from a psychiatric evaluation of the accused:

"TC: Paragraph 1 reads: This is to certify that the above named individual was evaluated at the 8th Field Hospital from 10 November 1968 to 15 November 1968.

"Paragraph 2 reads: This 21 years old single, enlisted man, with approximately 14 months active duty service and 9 months in Vietnam

---

[1] This accused has an intelligence score of 69. A person with an IQ between 65 and 70 is competent to stand trial. United States v Reed, 285 F Supp 738 (DC DC) (1968). He is not a person suffering from either a "disease" or a "defect" as those terms are defined in United States v Durham, 214 F2d 862 (CA DC Cir) (1954). United States v Moore, 277 F2d 684 (CA DC Cir) (1960).

was referred for psychiatric evaluation in connection with judicial proceedings.

"The other stipulated portion is the psychiatrist's findings, again with the consent of the accused:

"First, The accused at the time of the alleged offense was so far free from mental defect, disease, or derangement as to be able to distinguish right from wrong.

"Two, he was also so far free from mental defect, disease or derrangement [sic] to be able to adhere to the right.

"Three, the accused possesses sufficient mental capacity to understand the nature of the proceedings against him and should be able to assist the court in his own defense."

After findings and by way of mitigation, defense counsel read into evidence additional portions of the above-mentioned psychiatric evaluation. Since the whole of the report has been appended to the opinion of the majority, I need not set it forth in detail. The following excerpts will suffice:

". . . In a word, his judgement [sic] seems defective on the basis of his being unable to integrate complex, threatening social situations into meaningful behavior patterns. Beyond this his general intellect seems uniformingly [sic] dull and he is unable to make very simple abstractions. His IQ is 69 and this places him in the mentally subnormal population.

"Diagnosis:

"Mental subnormality, IQ 69 defective.

.    .    .    .    .

"I see him as now concealing consciously, or perhaps unconsciously, the true nature of his act because he cannot make sense out of what he did. He is more perplexed than we are regarding this event and while able to tell right from wrong and adhere to the right, then and now, his defective intelligence and emotional lability are important factors in the alleged crime. Further, he lacks insight into his own intellectual dullness and this lack plus his general defectiveness suggests he may have difficulty understanding all the procedures involved in his trial. *I would caution the court to consider that his mental ability is no more than that of a ten year old child."* [Emphasis supplied.]

Appellate defense counsel find it *incredible* that defense counsel at trial would agree to stipulate that the portions of the psychiatric evaluation most favorable to the Government could be taken out of context and read to the court-martial without even attempting to introduce those portions favorable to the accused, despite the fact that the whole defense hinged on the mental responsibility of the appellant.

.I most emphatically agree. The ultimate determinations made by the psychiatrist as to the sanity of the accused were opinions only and while the court was instructed that they alone were to decide the question, they were also told that the testimony came from an expert witness whose testimony, though not controlling on the issue, should be considered with due regard for the witness' qualifications. Without the benefit of the basis on which this opinion was formed, especially the psychiatrist's determination that the accused's "mental ability is no more than that of a ten year old child," it strains one's credulity to believe that the court would find contrary to this expert opinion. This finding alone, that the accused possessed a ten-year-old mentality, raises a serious question as to the validity of the determination that the accused could distinguish right from wrong and was able to adhere to the right. His capacity to understand the nature of the proceedings against him and to assist in his defense, to the very complicated charge of unpremeditated murder, is also very much in doubt by virtue of a mind of such tender years.[1]

---

[1] As my brothers note, the accused became a member of the armed forces

240

But that is not all, for there were other portions of the psychiatric evaluation, favorable to the accused, which were *never* presented to the court. For instance, the sentence in the same paragraph, following the statement as to the accused's ten-year-old mentality, states:

". . . He will have difficulty comprehending some facets of the courtroom procedure."

In addition, the findings portion of the report includes:

". . . In my opinion, he lacks sufficient mental capacity to 'intelligently conduct' his own defense in the sense he may not perceive the significance of some of his testimony nor understand the procedures of the court in determining guilt or innocence.

"(4) In my opinion the accused's mental defectiveness, emotional instability, past history, all indicate an inability to form the specific intent of premeditation, and rather that the alleged crime was an impulsive one committed by an unstable, mentally defective person."

The report concluded with a recommendation that:

"Regardless of the outcome of the Court-Martial I would suggest this enlisted man be separated from the armed forces under the provisions of AR 635–212 as unsuitable by virtue of his mental defectiveness."

Further, on the issue of mental responsibility, trial defense counsel also had available to him the opinion of a division psychiatrist, who was never called as a witness nor was his statement introduced at trial. On the basis of his interview of the accused, the former recommended formal psychological testing of the accused. In his report, he opined:

". . . He certainly has a severe character and behavior disorder, manifested by these serious lapses of impulse control. He also demonstrates a considerable intellectual deficit, such that I'm not sure he can understand and participate effectively in the trial, and even whether he can make reasonable judgment regarding right and wrong."

I find the situation in this case even more grievous than that which served as a basis for our reversal in United States v McFarlane, 8 USCMA 96, 23 CMR 320 (1957). In *McFarlane*, the investigating officer recommended that the accused be afforded a psychiatric examination. Defense counsel ignored that recommendation and made no effort to obtain evidence of the accused's early life, any deficiencies, mental or otherwise, and his previous behavior pattern. As we said in *McFarlane*, at page 100:

". . . Certainly we can find no justification for tossing away the remotest possibility of reducing the crime from felony murder to a lesser offense without some showing that the medical experts had made a thorough mental examination of the accused to ascertain his mental capacity to form the specific intent to steal or the intent to murder as required by the assault charge."

In the case at bar, the defense counsel, although asserting that the accused did not have the requisite mental capability, *not only allowed to go unrebutted the opinion of the psychiatrist but even stipulated its receipt into evidence.* Had he at the very least refused to stipulate and demanded the appearance of the witness, that opinion could have been tested by examination before the finders of fact and the latter then could have had a substantial basis for their determina-

---

under a program known as "Project 100,000," which involved the acceptance for military service of persons who did not qualify under the normal mental or physical standards. Persons accepted under this program received special training or treatment intended to permit them to become useful members of the armed forces.

tion as to the mental responsibility of the accused. Cf. United States v Thomas, 13 USCMA 163, 32 CMR 163 (1962). In the face of the unrebutted stipulation of testimony by an expert witness, that the accused could distinguish right from wrong and adhere to the right, defense counsel's assertion on argument that the accused lacked the requisite mental responsibility to establish guilt, can only be viewed as an exercise in futility.

An accused is entitled to a fair hearing. To that end his counsel is bound to present such evidence as is known and available to him, which would manifestly and materially affect the outcome of the case. United States v Rosenblatt, 13 USCMA 28, 32 CMR 28 (1962). See also, United States v Allen, 8 USCMA 504, 25 CMR 8 (1957); United States v Parker, 6 USCMA 75, 19 CMR 201 (1955). As this Court said in United States v Mitchell, 16 USCMA 302, 303, 36 CMR 458 (1966):

> "Defense counsel is an advocate for the accused, not an *amicus* to the court. Ellis v United States, 356 US 674, 2 L Ed 2d 1060, 78 S Ct 974 (1958). . . . he is obliged to marshal the evidence in the way most favorable to the accused."

In my opinion, the issue of the accused's mental responsibility has not been fully litigated. The ineptitude of trial defense counsel, in failing to recognize the value of the complete psychiatric report, deprived the accused of the effective assistance of counsel (United States v McFarlane, supra; United States v Horne, 9 USCMA 601, 26 CMR 381 (1958)), and prevented the members of the court-martial from properly and fairly testing the opinion of the psychiatrist. United States v Thomas, supra. Ineffective assistance of counsel is a denial of due process requiring reversal. United States v Horne, and United States v McFarlane, both supra.

I would reverse the decision of the board of review and order a rehearing.

**242**

APPENDIX

DEPARTMENT OF THE ARMY
MENTAL HYGIENE
CONSULTATION SERVICE
98TH MEDICAL DETACHMENT
(KO)
APO 96350

15 Nov 68

AVBJ-GA-FH-KO

SUBJECT: Psychiatric evaluation of PFC Gilbert Chappell Jr., US67096709 C Batt, 6/29th Arty

TO: Commanding Officer C Batt, 6/29th Arty

1. This is to certify that the above named individual was evaluated at the 8th Field Hospital from 10 Nov 68 to 15 Nov 68.

2. This 21 year old single, EM, with approximately 14 months active duty service and 9 months in Vietnam was referred by his defense counsel for psychiatric evaluation in connection with judicial proceedings. Pertinent documents, to include a Charge Sheet, Investigating Officer's Report, statements made by witnesses and a Psychiatric Evaluation dated 8 Nov 68 were reviewed by this examiner. The purpose of the evaluation was explained to him. He was advised of and understands his rights under Article 31, UCMJ, of his right to counsel, and of his right to remain silent.

3. According to witnesses, the accused on the date in question became involved in an argument with a PFC Kelley. Apparently, PFC Chappell, PFC Kelley, and PFC Stanko had consumed some beer and while engaged in some horseplay an argument broke out between PFC Chappell and PFC Kelley. Both have denied the accused was intoxicated, but the quarrel resulted in the accused threatening PFC Kelley with a loaded M-16. The quarrel broke off for about 15 minutes. only to resume and end with PFC Kelley telling the accused "he had an M-16 too". Actually only PFC Chappell had a weapon, but it appeared to witnesses (and presumably the accused) that PFC Kelley was going for his weapon

(which later proved not to be the case); in any case, PFC Chappell fired and killed PFC Stanko who was only a short distance from PFC Kelley. According to witnesses, after firing PFC Chappell walked away towards a Cpl Waible who describes the accused as being, "no problem . . . talking louder than normal . . . confused . . . docile." According to a statement of Captain Robillard after the incident the accused was, "bewildered . . . stunned . . . hard to understand . . ." Captain Robillard felt, as have others, that the accused had a very quick temper and had on one previous occasion chambered a round and threatened a fellow soldier.

PFC Chappell related an inconsistent account of the event. Basically he claims to have "no memory" for the event, but goes on to relate portions of the event and especially his feelings about PFC Kelley. According to him he and PFC Kelley were at odds for some time and he felt that PFC Kelley "had it in for me". He based this feeling on an alleged incident where Kelley had threatened him with a knife. He feels that on the day in question PFC Kelley was prepared and intended to harm him either with a knife or by shooting him. He vehemently denies antagonism for PFC Stanko; indeed, he describes him as a close friend and a "blue eyed brother".

4. Personal History:

PFC Chappell was born in Jacksonville Georgia on April 25th 1947. At that time his father was irregularly employed as a laborer. His birth was preceded by a half-sister (born out of wedlock) and followed by 3 brothers and two sisters. His earliest memories include the deprivation associated with rural poverty plus the "Coming and going . . . carrying on . . ." of his father, who proved to be a poor provider as well as prone to overindulge in alcohol. As time progressed, however, his father became a steady worker and more temperate in his personal habits. PFC Chappell feels there have always been "hard feelings" between he and his father, but he claims his relationship with his mother is a good one.

He went to Rock Hill Elementary School and 2 high schools. He repeated one or two grades and quit school at age 18 or 19 in the 11th grade. He claims both to have received average grades and to have had trouble with his subjects. In any case, he had to repeat at least two grades. He has always felt "picked on" although he cannot give any good reason why. It would seem that his speech impediment, small stature, gullibility, would have made him a natural target for childhood cruelties. Because of the teasing, he frequently resorted to fighting as a means of proving and protecting himself.

After he quit school, he went to work at odd jobs chiefly in the lumber mills. "I didn't trust my money", so he had his mother manage his financial affairs. Apparently she has more or less kept him free of difficulties throughout his life and the accused usually follows his mother's advice explicitly. At the time he was drafted, he had been unemployed for 2–3 weeks.

As an adolescent he was arrested on two occasions for fighting. He was referred to the juvenile authorities; however, he was never actually incarcerated or convicted (apparently) of any adult felony.

5. Family History:

His father is living and well. He has a speech impediment as well, but no one else in the family has. His mother is living and well. His 3 brothers and two sisters are living and well; all of the children have had or are having academic troubles and only the half-sister has graduated from high school.

6. Military History:

PFC Chappell entered active duty on 12 September 1967. He completed Basic Training at Fort Benning and AIT at Fort Leonard Wood. His DEROS is 14 Feb 69. His MOS is 36K20 (Wireman). He has no court-martials or reprimands, although he was reprimanded for missing a bed

**243**

check. He denies any hostility to the armed forces in general, but he has not liked being in RVN.

7. Previous Personality:

This is very hard to determine from his own accounts, but reading between the lines, and what he says, plus the report of witnesses, it appears he is a gullible, unsophisticated person who is freqoently teased and harrassed by his peers. He develops close friendships, but he is prone to rages. His self description includes a feeling he is two people, one of whom is "crazy mad". At these times he "doesn't feel himself", and feels he isn't "real". He is quite superstitious and believes in spells, witchcraft and the necessity to take precautions against those people and events.

8. Mental Status:

The accused is a slightly built, healthy appearing person who has a severe speech impediment, dull facies, and a general perplexed demeanor. He related well emotionally, but his lack of vocabulary makes the gathering of historical material difficult. His mood seems slightly depressed and his affect is constricted. He is oriented for time, place and person. He knows the President of the United States, knows the number of states in the Union, but has great difficulty doing simple calculations. For example, to the question, "if you had a dollar and spent 65 cents, how much change would you get?" he replies "35 cents" but only after a prolonged period of concentration. He was unable to calculate how many oranges he could buy for a quarter if 2 cost a nickel. He knows it's wrong to kill someone, but killing to "stay alive is okay". If he was in his barracks with his buddies and one of them threatened to kill him, he would "do nothing if he didn't have a weapon", but if he thought he had a weapon "he would keep an eye on him". In general to this and similar questions regarding hypothetical instances, usually where he might be threatened, he approaches the problem individually as one where he either acts or doesn't act and never perceives the necessity or possibility that he

could acquire assistance from others or from the usual controls of society. In a word, his judgment seems defective on the basis of his being unable to integrate complex, threatening social situations into meaningful behavior patterns. Beyond this his general intellect seems uniformingly dull and he is unable to make very simple abstractions.

9. Psychological Tests:

Please see the accompanying psychological report. His IQ is 69 and this places him in the mentally subnormal population.

10. Diagnosis: (1) Mental Subnormality, IQ 69 Defective. (2) Emotionally unstable personality manifested by poorly controlled angry outbursts. Predisposition—severe; Mental Subnormality. LOD—No. EPTS.

11. Discussion:

The accused is an intellectually dull person who has difficulty rendering appropriate judgment on complex social situations. His inability to come up with socially appropriate and reasonable solutions to adverse situations is further compounded by his inability to integrate his feelings into his thinking. His angry feelings overwhelm him as can be seen by his past history of similar rages, his self description as "being two people", and the reports of witnesses who describe his mental condition as confusion following the alleged homicide. Beyond this he has experienced a life long pattern of being a scape goat and inferior because of his gullibility, general dillness and speech impediment. This tendency to feel persecuted by his peers, his intellectual defects, and emotional lability are, in my opinion, all mitigating factors and elements contributing to the present event.

I see him as now concealing consciously, or perhaps unconsciously, the true nature of his act because he cannot make sense out of what he did. He is more perplexed than we are regarding this event and while able to tell right from wrong and adhere to the right, then and now, his defective intelligence and emotional lability are

important factors in the alleged crime. Further, he lacks insight into his own intellectual dullness and this lack plus his general defectiveness suggests he may have difficulty understanding all of the procedures involved in his trial. I would caution the court to consider that his mental ability is no more than that of a ten year old child. He will have difficulty comprehending some facets of the courtroom procedure.

12. Findings:

(1) The accused at the time of the alleged offense was so far free from mental defect, disease, or derrangement as to be able to distinguish right from wrong.

(2) He was also so far free from mental defect, disease or derrangement to be able, at the time, to adhere to the right.

(3) The accused possesses sufficient mental capacity to understand the nature of the proceedings against him and should be able, with assistance from the Court, to participate in his own defense. In my opinion, he lacks sufficient mental capacity to "intelligently conduct" his own defense in the sense he may not perceive the significance of some of his testimony nor understand the procedures of the court in determining guilt or innocence.

(4) In my opinion the accused's mental defectiveness, emotional instability, past history, all indicate an inability to form the specific intent of premeditation, and rather that the alleged crime was an impulsive one committed by an unstable, mentally defective person.

13. Recommendations:

Regardless of the outcome of the Court Martial I would suggest this enlisted man be separated from the armed forces under the provisions of AR 635–212 as unsuitable by virtue of his mental defectiveness.

/s/ James Janecek Jr.
JAMES JANECEK JR.
CPT, MC
Psychiatrist