UNITED STATES, Appellee,

v.

Specialist Four Nelson M. CORTES–
CRESPO, SSN 581–04–4914, United
States Army, Appellant.

CM 434897.

U. S. Army Court of Military Review.

23 April 1980.

Captain Michael B. Dinning, JAGC, argued the cause for the appellant. With him on the brief were Colonel Edward S. Adamkewicz, Jr., JAGC, Major Benjamin A. Sims, JAGC, and Major Carlos A. Vallecillo, JAGC.

Captain Dennis S. Cameron, JAGC, argued the cause for the appellee. With him on the brief were Colonel Thomas H. Davis, JAGC, Lieutenant Colonel R. R. Boller, JAGC, and Major Robert B. Williams, JAGC.

Before MITCHELL, DRIBBEN and GARN, Appellate Military Judges.

## OPINION OF THE COURT ON FURTHER REVIEW

MITCHELL, Senior Judge:

While appellant's conviction for the premeditated murder of his Korean girlfriend in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918, was originally pending before us, the United States Court of Military Appeals in its decision in *United States v. Frederick*, 3 M.J. 230 (C.M. A.1977) adopted the American Law Institute's (ALI) definition of insanity.[1] This Court set aside the findings and sentence after deciding that the trial court's application of the rejected standard of mental responsibility presented a fair risk of prejudice to appellant, who claimed, unsuccessfully, that he was not mentally responsible for his crime. A rehearing was authorized. Upon remand, the military judge, sitting as a general court-martial, applied the ALI standards and found appellant guilty of premeditated murder.[2] We now address anew the question of the mental responsibility of appellant at the time of the offense.

I

Appellant testified that on the night before the murder he dreamed of bloody and headless corpses strewn on the floor of his living quarters. Minutes before he began stabbing his victim a shadowy, grotesque human shape appeared on an adjoining wall. This apparition commanded him in Spanish to kill himself and the girl. Appellant asserts that he tried to overcome his servile compulsion to kill actuated by this diabolic command by praying to a holy picture which he carried in his wallet. His religious resources were apparently inadequate and toadyish because he savagely in-

1. Model Penal Code § 4.01, Proposed Official Draft (May 4, 1962). This test provides:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

(2) As used in this Article, the terms "mental disease or defect" do not include an abnormali-

ty manifested only by repeated criminal or otherwise antisocial conduct.

2. The appellant was sentenced to a dishonorable discharge, confinement at hard labor for life, forfeiture of all pay and allowances, and reduction to Private E–1. The convening authority approved the sentence as adjudged and credited the appellant with confinement already served.

flicted numerous, deep, and fatal lacerations to his victim's face, chest, back and hands with a butcher knife and superficially wounded himself in the chest.

Appellant denied having any major arguments with his girlfriend during the course of their relationship or of having fought with her immediately preceding the killing. He had planned to marry her and had purchased wedding bands for this purpose. He also believed his girlfriend had obtained a valid divorce from another soldier. It was, according to appellant, not until after his first trial that he learned she was still married at the time of her death.

The former testimony of the victim's sister, read into evidence after stipulation by both parties that she was unavailable as a witness, revealed she had heard loud screams and shouting coming from the room in which the appellant and his girlfriend were staying on the evening before and on the morning and afternoon of the day of the tragedy. The witness testified that she entered the room on the afternoon in question and found her sister lying on the floor with her hair disheveled and appellant leaning against the wall. After telling her sister that the two of them should return to their family home, the witness left the room. The victim did not heed her sister's advice and within 20–30 minutes thereafter, appellant began his fatal assault. Attempts by the sister to restrain appellant were fruitless. By the time she had fled the room and returned with help, the victim was mortally wounded, lying alongside appellant in an expanding pool of blood.

Two military policemen who arrived at the scene found affixed to the wall two wedding bands and a note addressed to appellant's mother.[3] No trace of blood was found on the note. One of the investigators testified he heard appellant state that the victim was a military dependent, that she had an ID card, and request that she be taken to a U.S. military hospital.

Appellant allegedly suffered a subsequent hallucinatory episode at a military hospital where he was taken for treatment of his minor chest wound. Although he claimed to remember little if anything of what transpired earlier, appellant told a chaplain that the devil had directed him in his ghastly actions. Later, when talking to a social worker, he began repeating the Spanish word for devil, "diablo," while gesturing toward a hospital desk. He then lunged forward and butted the desk with his head. Specialist Cortes-Crespo also claimed that he heard the voice of his dead victim calling to him during his first trial and complained of his bed mysteriously shaking at night during his confinement at the United States Disciplinary Barracks.

Testimony from persons who knew appellant before the offense portrayed him as an individual without any disciplinary problems, neat and well dressed, and who held a responsible position as a supervisor. He appeared to them to be well-adjusted socially with no inclination toward anger or violence.

Appellant's past civilian history presented a different picture. He reportedly had been hospitalized in Puerto Rico after attempting to stab his mother with a knife. His condition on that occasion was diagnosed as "(1) Psychosis with cerebral trauma; (2) Alcoholism; (3) Sharp psychotic outbursts with schizophrenic traces." There were also reports of an attack on his brother, of deliberately causing his automobile to overturn, resulting in injuries to himself and a girlfriend, and of sadistic acts with domestic animals.

## II

The events leading to the murder, appellant's past medical and social history, and

---

**3.** The note, written in Spanish, was translated to read:

> Forgive me mother, but I love her and we cannot marry. We are going together. Don't blame anyone for what happened.
> Nelo *
> May God forgive me.

I want that we be buried together. Well she also wants it and that it be with music. The ring of matrimony, save it mother and don't suffer for me, that I know God will forgive me.
* Appellant's nickname.

his actions after the offense was committed, were considered by the psychologist and four psychiatrists who examined appellant and testified as to his mental condition.[4] Their interpretations of these facts and the degree of importance they placed on them in making their final diagnoses differed considerably.

A psychologist and a psychiatrist who testified for the defense respectively diagnosed appellant's condition as residual and latent schizophrenia.[5] Both witnesses defined these conditions as a mental disease or defect because of which appellant could neither appreciate the criminality of his actions, nor conform his conduct to the requirements of law. The third expert witness for the defense had examined appellant shortly after the offense was committed, and served as a member of appellant's sanity board in Korea. This psychiatrist was of the opinion that appellant was suffering from a hysterical personality disorder.[6] Refusing to characterize this condition as a "mental disease or defect," be-

4. A psychiatrist is a medical doctor who usually has completed at least 3 years of postgraduate training in psychiatry (the branch of medicine concerned with the diagnosis and treatment of mental illness) at a recognized training hospital. Psychologists, on the other hand, are not physicians but hold advanced degrees in psychology. Clinical psychologists are the members of the latter group most frequently confused with psychiatrists because they have had special training in evaluating the personality structure of both healthy and mentally disordered persons. M. Guttmacher Weihofen, *Psychiatry and The Law* 5–12 (1952).

5. In defining the various psychiatric terms, defense and government experts relied upon The American Psychiatric Association's, *Diagnostic and Statistical Manual* (2d ed. 1968). The different categories of schizophrenia are defined by that publication as follows:

295 Schizophrenia
This large category includes a group of disorders manifested by characteristic disturbances of thinking, mood and behavior. Disturbances in thinking are marked by alterations of concept formation which may lead to misinterpretation of reality and sometimes to delusions and hallucinations, which frequently appear psychologically self-protective. Corollary mood changes include ambivalent, constricted and inappropriate emotional responsiveness and loss of empathy with others. Behavior may be withdrawn, regressive and bizarre. The schizophrenias, in which the mental status is attributable primarily to a thought disorder, are to be distinguished from the Major affective illnesses (q.v.) which are dominated by a Mood disorder. The Paranoid states (q.v.) are distinguished from schizophrenia by the narrowness of their distortions of reality and by the absence of other psychotic symptoms.
295.5 Schizophrenia, latent type
This category is for patients having clear symptoms of schizophrenia but no history of a psychotic schizophrenic episode. Disorders sometimes designated as incipient, prepsychotic, pseudoneurotic, pseudopsychopath-

ic, or borderline schizophrenia are categorized here. (This category includes some patients who were diagnosed in DSM–I under 'Schizophrenic reaction, chronic undifferentiated type.' Others formerly included in that DSM–I category are now classified under Schizophrenia, other [and unspecified] types (q.v.).)
295.6 Schizophrenia, residual type
This category is for patients showing signs of schizophrenia but who, following a psychotic schizophrenic episode, are no longer psychotic.

6. The American Psychiatric Association's, *Diagnostic and Statistical Manual* (2d ed. 1968), defines Personality Disorders as follows:

301 Personality disorders
This group of disorders is characterized by deeply ingrained maladaptive patterns of behavior that are perceptibly different in quality from psychotic and neurotic systems. Generally, these are life-long patterns, often recognizable by the time of adolescence or earlier. Sometimes, the pattern is determined primarily by malfunctioning of the brain, but such cases should be classified under one of the non-psychotic organic brain syndromes rather than here. (In DSM–I 'Personality Disorders' also include disorders now classified under Sexual deviation, Alcoholism, and Drug dependence.)
301.5 Hysterical personality (histrionic personality disorder)
These behavior patterns are characterized by excitability, emotional instability, over-reactivity, and self-dramatization. This self-dramatization is always attention-seeking and often seductive, whether or not the patient is aware of its purpose. These personalities are also immature, self-centered, often vain, and usually dependent on others. This disorder must be differentiated from Hysterical neurosis (q.v.).
A third edition of the American Psychiatric Association's, *Diagnostic and Statistical Manual* has been published recently. *See* note 26, *infra.*

cause he believed such terms were legal rather than medical, he defined hysterical personality as well as psychosis and schizophrenia as "mental disorders." [7] He believed that although appellant understood what he was doing, had the capacity to appreciate that his act was wrong, and to premeditate, his ability to prevent himself from doing the act was "significantly impaired."

The two psychiatrists who testified for the Government also diagnosed appellant's condition as a hysterical personality disorder, but differed with the defense witness as to the meaning of the term and the degree of impairment. Hysterical personality did not, in their opinion, fall within the category of "mental disease or defect," [8] and it did not significantly impair appellant's ability to control his actions at the time of the offense.

### III

The facts of this case illustrate the perplexing task of courts faced with the question of mental responsibility, when bombarded by esoteric medical labels and widely conflicting nosological opinions of expert witnesses. The correctness or adequacy of the factual assumption on which the expert's opinion is based, the reasoning used in reaching a conclusion, interest or bias, inconsistencies or contradictions in testimony, and the reliability of medical reports upon which the witness relied in arriving at a diagnosis, are issues which must be examined closely by opposing counsel skilled in the art of cross-examination. [9] However, we do not believe that the fact finders' determination as to whether the expert's definitions and conclusions are correct should be trusted entirely to how well counsel have been able to penetrate the inner workings of the expert's mind. The court is entitled to more. A consensus on controversial diagnostic categories would be a notable supplement. Thus a meaningful collaboration between academicians and experts in everyday matters would without question improve both diagnostic reliability and lagging public confidence.

The ALI/*Frederick* test provides the Court a standard to use in determining the effect mental disease or defect has on an accused before he can be relieved of criminal responsibility for his actions. This standard, however, does not include a definition of "mental disease or defect." The second paragraph of the ALI test defines these terms only in the negative: "[T]he terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." Except for its retention of this paragraph, the Court of Military Appeals in *Frederick* provided no other clue as to which mental conditions and behavior patterns found within the large psychiatric arena would be included in the legal definition of "mental

---

7. The psychologist and a psychiatrist who testified for the defense presented somewhat inconsistent views on the appropriate label for a "hysterical personality." The psychologist stated that the term could be included within the definition of "mental defect." Mental defect was defined by him as "those illnesses and aberrations that keep a person from being able to interact and function with their environment in an appropriate and reasonable fashion." The other defense psychiatrist expressed his definition in terms of a character and behavior disorder.

8. Unlike the defense psychiatrist, the government psychiatrist did not even attempt to place hysterical personality in the same general category of disorder as schizophrenia. It was defined by one as a ". . . behavior . . . characterized by emotional unstability (sic), ex-

citability, self-dramatization and attention seeking. . . ."

9. The different issues that counsel must consider in cross-examining the expert witness are discussed in *United States v. Ashe*, 478 F.2d 661 (D.C.Cir.1973); *Carter v. United States*, 252 F.2d 608 (D.C.Cir.1957); *United States v. Kossa*, 562 F.2d 959 (5th Cir. 1977), *cert. denied* 434 U.S. 1075, 98 S.Ct. 1265, 55 L.Ed.2d 781 (1978); *United States v. Abrams*, 427 F.2d 86 (2d Cir. 1970), *cert. denied* 400 U.S. 832, 91 S.Ct. 64, 27 L.Ed.2d 63 (1970); *United States v. Preciado-Gomez*, 529 F.2d 935 (9th Cir. 1976), *cert. denied* 425 U.S. 953, 96 S.Ct. 1730, 48 L.Ed.2d 197 (1976); *United States v. Retolaza*, 398 F.2d 235 (4th Cir. 1968), *cert. denied* 393 U.S. 1032, 89 S.Ct. 646, 21 L.Ed.2d 576 (1969); and *United States v. Partin*, 493 F.2d 750 (5th Cir. 1974).

disease or defect."[10] Failure to provide a definition will continue to cause confusion at both trial and appellate levels, for "what psychiatrists may consider a 'mental disease or defect' for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the jury's purpose in determining criminal responsibility." *McDonald v. United States*, 312 F.2d 847, 851 (D.C.Cir.1962); *Morris v. United States*, 217 F.Supp. 220, 230 (N.D. Texas 1963).[11]

This Court has previously invited the Court of Military Appeals to define "mental disease or defect." *See United States v. Chapman*, 5 M.J. 901 (A.C.M.R.1977) (Jones, Sr. J., concurring, Mitchell, J., concurring in part and dissenting in part). Such a definition has not been forthcoming. We believe the facts of this case present us with the opportunity and responsibility to formulate a needed definition.

Prior to *United States v. Frederick, supra,* the 1951 and 1969 Manuals for Courts-Martial contained identical language as to the military's test for mental responsibility and the definition of mental disease or defect included therein.[12] Under these tests, a character and behavioral disorder was not generally regarded as a mental disease or defect that would exonerate an accused from criminal responsibility,[13] although such a condition could negate an accused's capacity to entertain the specific intent required for the particular act charged. *United States v. Dunnahoe*, 6 U.S.C.M.A. 745, 21 C.M.R. 67 (1956); *United States v. Kunak*, 5 U.S.C.M.A. 346, 17 C.M.R. 346 (1954); *United States v. Silva*, 37 C.M.R. 803 (ABR), *pet. denied* 16 U.S.C.M.A. 664, 37 C.M.R. 471 (1966).

After the Court of Military Appeals adopted the ALI standard of mental responsibility the opinion has been advanced that the distinction between mental disease and defect, and personality, character and behavioral disorders was no longer as certain, for adoption of the new standard may have had the implied effect of eliminating the old definition and prior interpretations of it. *See United States v. Chapman, supra* (Jones, Sr. J., concurring, Mitchell, J., concurring in part and dissenting in part). We doubt whether personality, character and behavioral disorders were meant to be characterized as a mental disease or defect that can excuse criminal conduct under the ALI standard.[14] Rejection of the old standard

10. Moreover, the second paragraph of the ALI test is more in the nature of a policy statement than a definition.

11. The problem is dramatically illustrated in the case of *In re Rosenfield*, 157 F.Supp. 18 (D.D.C.1957), more commonly known as the "weekend flip flop case." On Friday, the petitioner's condition, described as a sociopathic personality, was not considered to be a mental disease. The following Monday, authorities at St. Elizabeth's Hospital determined as an administrative matter that the sociopathic personality would be characterized as a mental disease. *See also United States v. George*, 6 M.J. 880 (A.C.M.R.1979).

12. Paragraph 120, Manual for Courts-Martial, United States, 1951 and paragraph 120*b*, Manual for Courts-Martial, United States, 1969 (Revised edition) provided that:
   A person is not mentally responsible in a criminal sense for an offense unless he was, at the time, so far free from mental defect, disease, or derangement as to be able concerning the particular act charged both to distinguish right from wrong and to adhere to the right. The phrase 'mental defect, disease, or derangement' comprehends those irrational states of mind which are the result of deterioration, destruction, or malfunction of the mental as distinguished from the moral faculties. To constitute lack of mental responsibility, the impairment must not only be the result of mental defect, disease, or derangement but must also deprive the accused of his ability to distinguish right from wrong or to adhere to the right as to the act charged. Thus, mere defect of character, will power, or behavior, as manifested by one or more offenses, ungovernable passion, or otherwise, does not necessarily indicate insanity, even though it may demonstrate a diminution or impairment in ability to adhere to the right with respect to the act charged.

13. *See United States v. George, supra*, note 11 and cases cited therein.

14. Professor Weshler, the reporter of the Model Penal Code, believed that the intent of the ALI draftsmen was to make the defense of insanity available only to defendants suffering from "the most severe afflictions of the mind." (Weshler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Co-

and adoption of a new one for determining mental responsibility requires only that the old terminology be reexamined to determine the legal and practical consequences of its application to the new test.[15]

In *United States v. Kunak,* 5 U.S.C.M.A. 346, 17 C.M.R. 346 (1954) and *United States v. Smith,* 5 U.S.C.M.A. 314, 17 C.M.R. 314 (1954), the Court of Military Appeals reviewed the D.C. Circuit Court of Appeals decision in *Durham v. United States,* 214 F.2d 862 (D.C.Cir.1954), in considering whether to adopt a standard of mental responsibility different from that contained in the 1951 Manual for Courts-Martial.[16] One of the Court of Military Appeals' primary points of criticism of the *Durham* test was the uncertainty as to what types of mental abnormalities would be included therein and to what degree the act must have been the product of the illness. *United States v. Smith, supra,* at 322, 323. The same criticism was raised by other federal courts. *United States v. Currens,* 290 F.2d 751 (3d Cir. 1961) at 762, 763; *Sauer v. United States,* 241 F.2d 640 (9th Cir. 1957), *cert. denied* 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539 (1957).[17]

Although the Court of Military Appeals rejected the *Durham* test for mental responsibility, it impliedly adopted the distinction between the terms "disease" and "defect," contained in the *Durham* decision, when it found in the later case of *United States v. Chappell,* 19 U.S.C.M.A. 236, 41 C.M.R. 236, 239, n.1 (1970) that an accused with a limited intellect (I.Q. of 69) was "not a person suffering from either a 'disease' or a 'defect' as those terms are used in *United States v. Durham.*"[18] "Mental disease" was defined in *Durham* as "a condition which is considered capable of either improving or deteriorating," while "defect" existed when there is present "a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease." *Durham, supra,* 214 F.2d at 875.

Several years after *Durham,* the D.C. Circuit Court went a step further in *McDonald v. United States, supra* by actually defining the terms "mental disease or defect." The court stated:

> In *Durham,* rather than define either term, we simply sought to distinguish disease from defect. Our purpose now is to make it very clear that neither the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect. . . . [C]onsequently, for that purpose the jury should be told that *a mental disease or defect includes any abnormal condition of the mind which substantially affects*

lumbia L.Rev. 1425, 1443 (1968)). *See also United States v. Brawner,* 471 F.2d 969, 1025 (D.C.Cir.1972).

**15.** *United States v. Chappell,* 19 U.S.C.M.A. 236, 41 C.M.R. 236 (1970) and *United States v. Brawner,* 471 F.2d 969 (D.C.Cir.1972), both discussed *infra,* are cases in which the courts retained the distinctions between and definitions of "mental disease or defect" although the terms had been derived from a previously rejected or abandoned standard of mental responsibility.

**16.** *Durham* presented a far more liberal view of the insanity defense than existed in a majority of American jurisdictions at that time. Most federal and state courts adhered to the traditional common law, right-wrong test first expounded in *M'Naghten's* case, 10 CL&F. 200, 8 Eng.Rep. 718 (H.L.1843); or exonerated those criminal acts committed as a result of an "irresistable impulse." *Leland v. State of Oregon,*

343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952).

**17.** In *Carter v. United States,* 252 F.2d 608 (D.C.Cir.1957) and *Washington v. United States,* 390 F.2d 444 (D.C.Cir.1967) the D.C. Circuit Court attempted to resolve some of the ambiguities inherent in the phrase "product of" some mental illness and the problems created by it. In *Carter* the court stated that: "the mental illness must not merely have entered into the production of the act, but played a necessary role in its commission." *Carter, supra,* 252 F.2d at 615, 618. And in *Washington,* the court wholly forbade experts from testifying as to the productivity issue.

**18.** Mental retardation has been held to be a mental defect that will support an insanity defense. *McDonald v. United States,* 312 F.2d 847 (D.C.Cir.1962); *United States v. Masthers,* 539 F.2d 721 (D.C.Cir.1976).

*mental or emotional processes and substantially impairs behavior controls. McDonald, supra*, 312 F.2d at 851. (Emphasis supplied.)

In *United States v. Brawner*, 471 F.2d 969 (D.C.Cir.1972) (on rehearing en banc), the D.C. Circuit abandoned the *Durham* test for mental responsibility and adopted instead the ALI standard. In doing so, it elected to substitute the *McDonald* definition of mental disease or defect for that contained in the second paragraph of the ALI recommendation. The court reasoned that *McDonald* acted as a safeguard

> against the danger of misunderstanding and injustice that might arise from an expert's classification that reflects only a conception defining all criminality as reflective of mental illness. There must be testimony to show both that the defendant was suffering from an abnormal condition of the mind and that it substantially affected mental or emotional processes and substantially impaired behavioral controls. *Brawner, supra*, 471 F.2d at 993–994.[19]

The only other jurisdiction we have found that has followed *Brawner* in applying the *McDonald* definition to the ALI standard is the District of Columbia Court of Appeals[20] in the case of *Bethea v. United States*, 365 A.2d 64 (D.C.App.1975), *cert. denied* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977).

Other Federal courts have rejected the *McDonald* definition on the basis that the ALI test eliminates the problem of vagueness that was found in *Durham* as to when a criminal act is the product of a mental disease or defect.[21] In the words of one court, "The jury, when informed of the result of a mental disease or defect which would constitute legal insanity [under the ALI formula], is able better to understand what a mental disease or defect is." *Government of Virgin Islands v. Fredericks*, 578 F.2d 927, 932–933 (3rd Cir. 1978). For this reason, a definition of the terms was believed to be unnecessary.

■ The opinions of these courts are unpersuasive, for in our view neither the ALI test nor the *McDonald* definition, whether standing alone or combined, eliminate the uncertainty as to the meaning of "mental disease or defect." *McDonald* attempted to restrict expert testimony as to the meaning of these terms, but in the process, created its own ambiguity. The use of the phrase "any abnormal condition of the mind" is an open ended definition that requires in most cases an inquiry into causality. The problem is succinctly stated by Judge Bazelon in his separate concurring and dissenting opinion in *United States v. Brawner, supra* :

> "[T]he defense is not restricted to persons suffering from the gravest types of mental disorders. While the jury must find that the defendant's 'mental or emotional processes' have been 'substantially affected' and his 'behavior controls' 'substantially impaired,' the jury is not bound by whether these consequences flow from what the psychiatrists label a 'psychosis,' 'psychoneurosis,' a 'sociopathic personali-

---

19. For further discussion by the D.C. Circuit Court of its application of the *McDonald* definition to the *Brawner* / ALI standard, *see United States v. Moore*, 486 F.2d 1139 (D.C.Cir.1973); *United States v. Peterson*, 509 F.2d 408 (D.C. Cir.1974); *United States v. Jackson*, 553 F.2d 109 (D.C.Cir.1976).

20. The District of Columbia Court of Appeals is to be distinguished from the United States Court of Appeals for the District of Columbia Circuit. The Court Reorganization Act, District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L.No.91–358 (July 29, 1970) (effective 1 Feb. 1971) declared that the District of Columbia Court of Appeals would be the "highest court of the District of

Columbia," and eliminated the prior power of the United States Court of Appeals for the District of Columbia Circuit to review that Court's judgment. *See also M. A. P. v. Ryan*, 285 A.2d 310 (D.C.App.1971).

21. *Government of Virgin Islands v. Fredericks*, 578 F.2d 927, 932–933 (3rd Cir. 1978); *United States v. Frazier*, 458 F.2d 911, 915 (8th Cir. 1972); *Wade v. United States*, 426 F.2d 64, 68–72 (9th Cir. 1970) (en banc); *Blake v. United States*, 407 F.2d 908, 914–916 (5th Cir. 1969) (en banc); *United States v. Smith*, 404 F.2d 720, 724–727 (6th Cir. 1968); *United States v. Chandler*, 393 F.2d 920, 925–929 (4th Cir. 1968) (en banc).

ty,' an 'emotionally unstable personality,' or whatever." If we are indeed to retain the expansive definition of mental illness implicit in *Durham* and formalized in *McDonald,* then the productivity question will remain a source of controversy and debate. *Brawner, supra,* 471 F.2d at 1025.

■ As we noted earlier in this opinion, the productivity question and the uncertainty as to what types of mental abnormality would be included therein had been foreseen by the Court of Military Appeals as objectionable consequences to adopting the *Durham* test. *United States v. Smith, supra,* at 322. The *McDonald* definition without further refinement maintains this uncertainty. In our view, the courts at the trial and appellate levels will have a greater understanding of what conditions may be included in the terms "mental disease or defect" if the definition in *McDonald* is combined with those definitions not in conflict with the ALI/*Frederick* standard that have been time tested through the years and approved by military and other federal jurisdictions. For this purpose we turn to the following sources: *McDonald v. United States, supra,* at 851; the sample instructions contained in *United States v. Brawner, supra,* at 1008–1009; that portion of the definition of mental disease or defect contained in paragraph 120*b,* Manual for Courts-Martial, United States, 1969 (Revised edition) which is not in conflict with the ALI/*Frederick* standard;[22] the distinction between mental disease and defect found in *United States v. Durham, supra,* and impliedly adopted by the Court of Military Appeals in *United States v. Chappell, supra*; and the wording presently included within paragraph two of the ALI test and adopted by the Court of Military Appeals in *United States v. Frederick, supra.*[23]

■ Accordingly, we have formulated the following definitions: The terms "mental disease or defect" include any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls and are the result of deterioration, destruction, malfunction, or nonexistence[24] of the mental, as distinguished from the moral faculties. The term "behavior controls" refers to the processes and capacity of a person to regulate and control his conduct and his actions.[25] A "mental disease" is distinguished from a "mental defect" in that the former condition is considered capable of either improving or deteriorating, while a "mental defect" exists when there is present a condition not capable of either improving or deteriorating and which maybe either congenital, or the result of injury, or the residual effect of a physical or mental disease. The terms mental disease or defect do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

We believe that these definitions will eliminate some of the uncertainties of the ALI/*Frederick* standard and at the same time further limit the phrase "any abnormal condition of the mind" contained in the *McDonald* definition to only the most serious mental disorders that result from one of the debilitating factors listed in the Manual and included herein.

### IV

■ We have carefully considered the conflicting diagnoses presented by the defense and government expert witnesses and the facts and assumptions upon which they based their conclusions. While we must choose between some of their opinions, we need not, and do not, choose between their

**22.** *See* note 15, *supra.*

**23.** We also take special note of the proposed military judge's instructions contained in an official Army publication. *See* Taylor, "Building the Cuckoo's Nest," *The Army Lawyer,* June 1978, at 36, 38.

**24.** Nonexistence does not appear in the *Manual* definition but is included here so as to account for the mentally deficient individual. *See* note 18, *supra.*

**25.** *See United States v. Brawner* at 1008, proposed draft instruction.

diagnostic categorizations.[26] In choosing between their opinions we have considered, *inter alia*, the experts' training and experience, the time they spent in evaluating the appellant, the reports upon which they relied, and their conclusions and assumptions as to the facts and circumstances surrounding the killing. From all of the proof presented, we believe that appellant's offense was triggered by some act of provocation. This conclusion is supported by evidence that appellant had learned that he could not consummate the planned marriage with his girlfriend because she had not obtained a divorce, and testimony from the victim's sister that she heard the appellant and his girlfriend revilingly arguing on several occasions immediately preceding the offense. We have also placed considerable emphasis on the murder/suicide note that was written by appellant to his mother expressing guilt and/or sorrow for his actions.

We are not in complete accord as to whether or not appellant, at the time of the slaying, was affected by a mental disease or defect as we have defined those terms. However, after considering all the evidence in the record, we unanimously agree, either on the basis of being convinced beyond a reasonable doubt that appellant was not suffering from a mental disease or defect, or on the basis of being convinced beyond a reasonable doubt that appellant did not lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, that the killing by appellant may not be excused on the basis of insanity.

We are equally convinced that appellant was able to, and did, premeditate the murder.

The findings of guilty and the sentence are AFFIRMED.

Judge DRIBBEN and Judge GARN concur.

---

**26.** The diagnostic categorizations would have been different if the latest (3d edition) of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, published this year, had been the reference publication for the experts at trial. *See* Spitzer, Williams and Skodol, *DSM III: The Major Achievements and an Overview*, 137 Am. Psychiatry 151 (1980). That does not mean, however, that the experts' opinions about the essential nature and effects of appellant's mental condition would have been different.