OPINION OF THE COURT
Harvey M. Sklaver, J.
In this proceeding to terminate the parental rights of Alisa B. as regards her son Timothy Maurice B. the petition alleges two causes of action. The first cause of action is grounded on mental illness (Social Services Law § 384-b [4] [c]).
* * *
I
Ms. B. is 24 years of age. She has been a chronic substance abuser, principally of cocaine, since the age of 14 when, by her own admission, she began smoking marihuana. The following year, 1986, at age 15, she began a series of 12 psychiatric hospitalizations at four separate institutions.[1] Those institutions have at various times diagnosed Ms. B. as suffering from paranoid schizophrenia, schizoaffective disorder and schizophreniform disorder[2] as well as substance abuse disorder and mixed personality disorder. In connection with this proceeding *124 Ms. B. was examined by Dr. Walter Flegenheimer, a psychiatrist on the staff of the court’s Mental Health Service. His diagnosis was that of "chronic undifferentiated schizophrenia”. Ms. B. was also examined by a psychiatrist of her choice, Dr. Robert J. Kaplan. His conclusion was that "It is not possible to state that Alisa B. suffers from a mental illness.”[3] Their disagreement revolved around the impact that Ms. B.’s chronic drug abuse had, or should have had, on the earlier hospital diagnoses.
The operative facts are not in dispute. Both doctors reviewed the same medical records and, during their respective interviews of Ms. B., neither observed any formal thought disorder. The records reflect a pattern of what the court will characterize as bizarre behavior[4] by Ms. B.
if! ^ ^
Apart from the details of the aberrant behavior the medical records are replete with references to substance use[5] as related by Ms. B. and as concluded by the medical staffs. Those references, however, cannot be taken completely at face value. Some of the statements that Ms. B. gave to hospital staff and to Doctors Flegenheimer and Kaplan were inherently inconsis- - tent as to the nature and extent of her drug use, i.e., what she used, when she started using it, periods of abstinence, amount of time that elapsed since last use, etc. Neither doctor considered Ms. B. to be a reliable informant. It may be fairly said that the information she provided was consistently inconsistent.
II
As stated earlier, Dr. Flegenheimer’s opinion is that Ms. B. was suffering from chronic undifferentiated schizophrenia while Dr. Kaplan believed that the medical records could not be read to reach that conclusion. In his report and in his testimony-in-chief, Dr. Flegenheimer relied on the revised third edition of Diagnostic And Statistical Manual Of Mental *125 Disorders (DSM-III-R), which was published in 1987,[6] while Dr. Kaplan relied on the fourth edition (DSM-IV) which was published in May 1994.[7] Dr. Kaplan noted that the differences between the two editions of the DSM, insofar as they relate to this case, concern the impact of substance abuse on a diagnosis of schizophrenic type disorders.[8] Since it is well known that cocaine use, particularly regular and long-term use, can produce symptoms akin to those produced by schizophrenic type disorders, DSM-IV precludes a schizophrenic type diagnosis when there is a history of substance abuse unless (a) there is a history of schizophrenic type disorder which antedates the substance use or (b) there is a four-week period of known abstinence immediately preceding the onset of the symptoms.[9] Dr. Flegenheimer was in general agreement with the principle but considered it inapplicable in this case. The greatest disagreement between the two expert doctors stemmed from the conclusions each drew as to the actual drug use history as reported by Ms. B., whom they both considered to be an unreliable informant. From the entire record Dr. Kaplan concluded Ms. B. began using cocaine prior to her first hospitalization at age 15. Doctor Flegenheimer, on the other hand, despite his acknowledgment that Ms. B. was not a reliable informant, accepted at face value her statement that she did not begin using cocaine until two years later at age 17. He determined that the initial diagnosis of schizophreniform disorder as made by the doctors at Jacobi Hospital when Ms. B. was 15 years of age was correct, even under DSM-IV.[10] Thus, he concluded that there existed a schizophrenic type diagnosis which antedated the cocaine use, thereby permitting *126 a similar diagnosis in the absence of a known four-week period of abstinence preceding the symptoms.[11]
Ill
Social Services Law § 384-b (4) (c) permits the court to commit the custody and guardianship of a child to the Commissioner of Social Services when the parents are presently and for the foreseeable future unable "by reason of mental illness” to provide adequate care for a child who has been in foster care for a year immediately prior to the commencement of the proceeding. Mental illness is defined in subdivision (6) (a) as "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that if such child were placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child as defined in the family court act” (emphasis added). The petition herein, tracking the language of the statute, alleges: "Ms. B. is afflicted with a mental disease manifested by a disorder in behavior, thinking, feeling or judgment to the extent that Timothy would be in danger of becoming a neglected child if placed in or returned to Ms. B.’s care and custody and by reason of which Ms. B. is unable presently and for the forseeable future to provide adequate and proper care for Timothy.” Since the petition alleges only "mental disease” the court must determine whether that term is to be distinguished from "mental condition”. In United States v Cortes-Crespo (9 MJ 717), the United States Army Court of Military Review, in a scholarly opinion, undertook a detailed definition of the penal code phrase "mental disease or defect”, distinguished between "mental disease” and "mental defect” and further defined each of those terms.[12] On appeal, however, the United States Court of Military Appeals (13 MJ 420) rejected the distinction in favor of the more general definition contained in American *127 Law Institute’s Model Penal Code § 4.01.[13] The court wrote (at 422): "we find that we.can no better define the terms 'mental disease or defect’ than by use of the terms themselves. In accepting the ALI definition, we appreciate the clarity of the phrase 'mental disease or defect,’ and now believe that attempts at further definition will be confusing rather than clarifying.”[14] While "mental disease or defect” is the phrase used in criminal codes and "mental disease or condition” is the phrase used in the Social Services Law this court agrees that here it should abjure a precise definition of mental disease, as distinguished from mental condition.[15] This court cannot find fault with the American Psychiatric Association’s rejection of both terms in favor of "mental disorder”. The real issue is whether Ms. B.’s mental status is such that presently she has and for the foreseeable future will have a "disorder or disturbance in behavior, feeling, thinking or judgment to such an extent” that her child would be in danger of neglect if returned to her. In addressing the issue from that perspective the court notes that subdivision (6) (e) of Social Services Law § 384-b requires the examination and testimony of a psychiatrist or psychologist in every proceeding to terminate parental rights on the grounds of mental illness or mental retardation. And the court would certainly expect the examiner to have conducted the examination and rendered the report in accordance with the recognized standards and practices of the profession. Since the psychiatry discipline of the medical profession, in its authoritative DSM Manual, has eschewed the *128 terms "mental disease” and "mental condition” in favor of "mental disorder” section 384-b of the Social Services Law should be construed in light of the standards and practices of the profession. It is unrealistic to expect a psychiatrist to testify that a person has a mental disease when the profession’s authoritative Manual does not even use that term. Consequently, the court concludes that there is no legal distinction between the terms "mental illness”, "mental disease” and "mental disability” as used in section 384-b of the Social Services Law (whether or not there is a medical distinction) and that those terms are synonymous with the term "mental disorder” as used in DSM-III-R and DSM-IV. To some extent this conclusion is supported by the definition of " 'Persons with serious mental illness’ ” as found in section 1.03 (52) of the Mental Hygiene Law. That phrase "means individuals who meet criteria established by the commissioner of mental health, which shall include persons who are in psychiatric crisis, or persons who have a designated diagnosis of mental illness under the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders and whose severity and duration of mental illness results in substantial functional disability.” But, as noted, the DSM does not itself define mental illness and it appears that in Mental Hygiene Law § 1.03 (52) the terms are used interchangeably.[16] Additionally, synonymizing the various phrases, when considered in light of the entire statute, may be viewed as comporting with language in DSM-IV. In the Introduction (at xxiii) is the following comment: "These dangers [misuse or misunderstanding of diagnostic information] arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-IV disorder is not sufficient to establish the existence for legal purposes of a 'mental disorder,’ 'mental disability,’ 'mental disease,’ or 'mental defect.’ In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is usually required beyond that contained in the DSM-IV diagnosis. This might include information about the individual’s functional impairments and how those impairments affect the particular abilities in question. It is precisely because impairments, *129 abilities and disabilities vary widely within each diagnostic category that assessment of a particular diagnosis does not imply a specific level of impairment or disability.” This is, in effect, the legal standard. The fact-finding stage of a proceeding under Social Services Law § 384-b (4) (c) requires three distinct findings. There must first be the finding of condition, whether it be called "mental disease”, "mental illness”, "mental disorder” or whatever name one chooses to call it. There must then be a second finding that the condition, whatever it be called, is of such extent that a child in respondent’s care would be in danger of being or becoming a neglected child. Finally, there must be a finding that such condition will continue beyond the foreseeable future.
IV
The court is unable to find that the petitioner has established by clear and convincing proof (see, Santosky v Kramer, 455 US 745) that Ms. B. suffers from schizophrenia or other schizophrenic type disorder. Dr. Flegenheimer based his opinion on a single 75-minute interview with an unreliable informant and the medical records reflecting many inconsistent statements that she made to her various treating physicians regarding her drug use.[17] The court is not prepared to accept an opinion rendered under DSM-III-R when DSM-IV was the operative professional Manual. This court cannot accept the explanation that the Family Court Mental Health Service allowed its doctors to render opinions based on an outdated Manual and that they had more than six months, until January 1, 1995, before being required to use DSM-IV.[18] Significantly, a near-final draft of DSM-IV had been in circulation for a year so that members of the profession could study and critique it before final release in May 1994 (see, DSM-IV, at xvi). Upon his being recalled as a rebuttal witness Dr. Flegenheimer did opine that even under the strictures of DSM-IV Ms. B. was suffering from a schizophrenic type disorder. However, in arriving at his opinion he accepted as fact the statements Ms. B. made to her treating physicians as to when she began using cocaine and the length of abstinence before any particular hospitalization. Also, he assumed that Ms. B. *130 was not using cocaine during the periods of hospitalization, although on one occasion she was found smoking marihuana in the hospital ward. This is a thin reed upon which to conclude that Ms. B. suffers from chronic undifferentiated schizophrenia, particularly in view of the various Jacobi diagnoses beginning in August 1993, when the near-final draft of DSM-IV was in circulation for review and critique.
While the court cannot find that Ms. B. suffers from a schizophrenic type disorder, whether schizophrenia or schizoaffective, it has been established by clear and convincing proof that she does suffer from a mental disorder. Mental disorder has been defined in DSM-IV (at xxi-xxii) as "a clinically significant behavioral or psychological syndrome or pattern that occurs in an individual and that is associated with present distress (e.g., a painful symptom) or disability (i.e., impairment in one or more important areas of functioning) or with a significantly increased risk of suffering death, pain, disability, or an important loss of freedom. In addition, this syndrome or pattern must not be merely an expectable or culturally sanctioned response to a particular event, for example, the death of a loved one. Whatever its original cause, it must currently be considered a manifestation of a behavioral, psychological, or biological dysfunction in the individual.” Within the parameters of that definition it is clear that Ms. B. does suffer from some form of substance-related disorder (DSM-IV, at 175-272). Whether it be a substance use disorder (dependence or abuse) or a substance-induced disorder (intoxication, withdrawal, delerium, dementia, amnesia, psychosis, etc.) is not significant here. It appears to this court that Ms. B. suffers from both a substance use and a substance-induced disorder. For the past 10 years she has been a chronic user of illegal drugs, whether they be marihuana, cocaine or heroin.[19] She has been unable to wean herself from those drugs and their effect upon her has been disastrous, as reflected in her many psychiatric hospitalizations and the circumstances which gave rise to each of those hospital admissions. Ms. B.’s children have been removed from her care and placed in foster care. Yet, she has done very little, if anything, to rehabilitate herself and recover the care of her children, despite her genuine desire for that to occur. These are features of substance dependence (DSM-IV, at 176) and substance abuse (DSM-IV, at 182). Within the broad class of substance- *131 induced disorders Ms. B. has exhibited the features of substance intoxication, possibly substance withdrawal and certainly substance-induced psychosis (DSM-IV, at 183-185, 221-226, 310-315). Since Doctors Flegenheimer and Kaplan were not asked to opine on whether Ms. B. suffered from a substance-related disorder this court will not specifically find that she does. However, this court does find upon clear and convincing proof that Ms. B. is suffering from either a schizophrenic type disorder or a substance-related disorder or both. The precise DSM-IV classification is unimportant. Suffice it to say, Ms. B. is suffering from a mental disorder.
Implicit in the foregoing is the conclusion that long-term drug dependence can, in an appropriate case, constitute mental illness within the meaning of Social Services Law § 384-b.[20] This conclusion may be seen as disagreement with Matter of James S. (98 Misc 2d 650). There, the Family Court held that extreme alcohol addiction is not a mental illness as defined in Social Services Law § 384-b. However, that case was decided in 1979, at a time that DSM-II was the operative diagnostic Manual. That Manual, no doubt useful in its day, contained little, if anything, more than is contained in the appendices to DSM-IV. Indeed, the discussion of substance-related disorders in DSM-IV is far longer than the entire DSM-II Manual. In Matter of James S. (supra, at 653) the court wrote that "Although some authorities make reference to alcohol as a mental illness, the court-appointed psychiatrist in this proceeding, declined to equate the two conditions. He testified that mental illness is generally equated with psychosis.” That view, apparently, no longer prevails. Although the statutory definition of "mental illness” includes "mental disease” Dr. Flegenheimer testified that he could not define that latter term and that the profession preferred the more generic term of "mental disorder”.[21] Ms. B.’s expert, Dr. Kaplan, testified in response to a question posed by the court, "Well, I wouldn’t disagree with that if you rendered a decision stating that chronic drug use for so many years consisting of her entire adult life and no level of functioning off drugs for a prolonged period of time, if that constitutes, if you say that was therefore going to be called mental illness, I can’t argue with *132 that.”[22] Dr. Flegenheimer expressed the same opinion.[23] Also, as noted earlier herein, the phrase " 'Persons with serious mental illness’ ” was added to the Mental Hygiene Law in 1993 (L 1993, ch 723). It is defined in section 1.03 (52) thereof as including persons having a designated mental illness under the most recent edition of the DSM, among others.[24] Thus, Matter of James S. (supra) was correct when written but that court’s analysis no longer comports with current thinking within the psychiatric branch of the medical profession.[25]
The second question to be addressed is whether Ms. B.’s mental disorder is of such magnitude as to render her unable to provide proper and adequate care for her child. Timothy was born in May 1988, with a positive toxicology for cocaine and, consequently, was placed in foster care upon his discharge from the hospital. Nine days after Timothy’s birth Ms. B. was brought to Jacobi by ambulance and found to have homicidal and paranoid ideations and loosened associations. Between then and December 1993, she spent varying periods of time in mental hospitals on eight separate occasions, some of those hospitalizations lasting several months. Whether the causes of those hospitalizations were of psychotic origin or substance-related origin is not important. Only that they render her unable to care for her child is important. If they were psychotic in origin Ms. B. has shown herself either unwilling or unable to continue on a regimen of psychotropic medication. If they were substance related in origin she has shown herself unwilling or unable to complete a drug treatment program and wean herself from her drug habit. Based on the clear and convincing proof presented the court finds that Ms. B. is presently unable to properly care for her child who has been in placement with the Commissioner of Social Services for more than one year.
The final point to be decided on this over-all question of mental illness is whether Ms. B.’s inability to adequately care for her child extends beyond the foreseeable future. The record clearly reveals that she has been a drug addict for her entire adult life and has never made a serious attempt to *133 address her addiction. It further reveals that she has consistently abandoned her medication regimen without professional advice. There is nothing in the record from which the court can even infer that Ms. B. will even enter, no less complete, a drug rehabilitation program nor continue on any prescribed medication. Most significant is Ms. B.’s failure to recognize that she has a mental disorder, whether psychotic or substance related. She viewed her problem as being simply stress related. Consequently, the court has no alternative but to find that Ms. B.’s inability to adequately care for her child will continue into the foreseeable future.
[Portions of opinion omitted for purposes of publication.]

. A transfer from one institution to another is counted as a single hospitalization.

. Schizophrenia, schizoaffective disorder and schizophreniform disorder are similar yet distinct disorders (DSM-IV, at 274-296). (See, n 6, infra.)

. Dr. Kaplan chose his words .carefully. His testimony was to the effect that he could not say Ms. B. was not suffering from schizophrenia. He could only say that from her medical history he could not conclude that she was.

. This phrase is selected so as to avoid using a medical term.

. The court abjures the word "abuse” since it is a specific diagnosis under substance use disorders, which itself is one of two groups of substance use disorders. Substance-induced disorders is the other group (see, DSM-IV, at 176). In ordinary language, however, Ms. B. was a heavy substance abuser.

. The DSM is significant because it is published by the American Psychiatric Association and is universally accepted as authoritative by mental health professionals. It sets forth the' common language of the profession. The diagnostic criteria set forth therein are based on the results of extensive research and field testing. Based on that research and testing the Manual is periodically revised and republished in updated editions.

. Dr. Kaplan acknowledged, however, in his testimony, that Dr. Flegenheimer’s conclusion is supported by a reading of DSM-III-R.

. The court uses the phrase "schizophrenic type disorders” in a nonmedical, generic, sense for disorders having symptoms similar to schizophrenia. By using the phrase the court makes no finding as to whether the DSM-IV criteria for any specific disorder (e.g., schizophrenia, schizoaffective, schizophreniform or schizotypal) have been met.

. See, DSM-IV, at 5-7, 192-194, 283.

. While not conclusive in an individual case, it should be noted that "The median age of onset for the first psychotic episode of Schizophrenia is in the mid-20s for men and in the late 20s for women.” (DSM-IV, at 282.)

. Dr. Flegenheimer also found four-week periods of abstinence from the fact that several of the hospitalizations lasted far longer than four weeks. He assumed that Ms. B. did not use cocaine while hospitalized. However, it is well known to those involved with the criminal justice system that illicit substances often find their way into supposedly secure facilities, including prisons. Significantly, on one occasion Ms. B. was found smoking marihuana in the hospital ward.

. In this regard Cortes-Crespo (supra) addressed an unusual problem similar to the one presented herein. There, psychiatric evaluations and reports were made under DSM-II but DSM-III was published while the case was still at the trial stage and the experts battled over those changes.

. That section provides in subdivision (1) that "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law.” Subdivision (2) provides that "the terms 'mental disease or defect’ do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.” The Reporters’ Explanatory Note to this section acknowledges that it does not define mental disease or defect, "those terms being left open to accommodate developing medical understanding.”

. This is much like Justice Potter Stewart’s comment regarding hardcore pornography in Jacobellis v Ohio (378 US 184, 197), "I shall not today attempt to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it.”

. Dr. Flegenheimer testified, in response to a question posed by the court on this point, that he could not define mental disease and that the medical profession preferred the more generic term of mental disorder as used in the DSM.

. However, in section 1.03 (20) the term mental illness is defined in language similar to that in Social Services Law § 384-b (6) (a) by using the terms mental disease and mental condition.

. This may be an anomalous instance in which, to protect the rights of the child, the court must permit a person to benefit from her inconsistent statements.

. Transcript of Nov. 1, 1994, at 33-35.

. She has admitted to using all three drugs.

. An appropriate case may be one in which physical, emotional or psychological functioning is significantly impaired as a result of the drug use.

. Transcript of Jan. 24, 1995, at 55-56.

. Transcript of Dec. 12, 1994, at 92.

. Transcript of Jan. 24, 1995, at 57-58.

. Since the DSM does not define mental illness this court has equated that legal term with the medical term of mental disorder (see, III, supra).

. In DSM-IV alcohol-related disorders, like cocaine-related disorders, is simply a subclassification under the general rubric of substance-related disorders.